BASF WYANDOTTE CORP., FORMERLY WYANDOTTE CHEMICALS CORP., PETITIONER *v*. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6838–72.   Filed August 28, 1974.

*Steven Ugelac*, for the petitioner.
*Chauncey William Tuttle*, for the respondent.

DRENNEN, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes in the amounts of $34,644.25 and $208,037.17 for the calendar years 1964 and 1965, respectively. Due to concessions by the parties, the only issue remaining for decision by the Court concerns determination of depreciation required to. be recaptured by petitioner under section 1245, I.R.C. 1954, upon sale in 1965 of two powerplants consisting of 1,500 items of tangible personal property which had been contained in a multiple-asset account for depreciation purposes. This in turn depends upon (1) whether petitioner was entitled to compute depreciation recapture (section 1245 gain) separately for each of the 1,500 items, or whether the items were to be treated as one aggregate property for recapture purposes; (2) whether, if the former, recapture on items owned by petitioner as of December 31, 1961, is limited to their adjusted bases on that date; and (3) whether petitioner has carried its burden of proving an acceptable allocation of the lump-sum sale price to the individual assets involved.[1]

### FINDINGS OF FACT

Petitioner was a Michigan corporation with its principal offices in Wyandotte, Mich., at the time the petition herein was filed. Petitioner is the successor by merger to Wyandotte Chemicals Corp. (Wyandotte), which was also a Michigan corporation whose principal offices were in Wyandotte, Mich. Wyandotte's returns for the years 1964 and 1965 were filed with the district director of internal revenue at Detroit, Mich. Wyandotte kept its books and reports its income on the accrual method of accounting.

During 1965, and for many years prior thereto, Wyandotte was in the business of manufacturing and selling bulk chemicals for industrial use. One of Wyandotte's plants was in Wyandotte, Mich., and at that location Wyandotte used two steam and electricity-generating powerplants. These plants consisted of real property and 1,500 items of tangible personal property, including various turbo generators, boilers, motors, pumps, switches, conveyors, turbines, powerlines, etc. Except for peak period requirements, these powerplants generally satisfied Wyandotte's needs for steam and electricity at the Wyandotte, Mich., plant.

The present case concerns a portion of the tangible personal. property associated with the powerplants which was depreciated on a

---

[1] The deficiency for 1964 was settled by stipulation of the parties.

straight-line basis and which will be referred to as the "straight-line properties." The remaining properties associated with the powerplants were depreciated by other than a straight-line method and are not involved here. Prior to January 1, 1962, the total original cost of the straight-line properties was $9,955,116. Total depreciation allowed or allowable prior to January 1, 1962, for Federal income tax purposes under section 167 with respect to the straight-line properties was $7,109,791. This depreciation was an aggregate of amounts determined separately for each item of straight-line property. The total undepreciated cost of the straight-line properties on January 1, 1962, was $2,845,325; as of that date, some of the straight-line properties had been fully depreciated, while others had some portion of their original cost remaining unrecovered through depreciation.

Effective January 1, 1962, Wyandotte transferred all of the straight-line powerplant properties and other properties consisting of machinery and equipment to one open-end, multiple-asset depreciation account in accordance with the provisions of section 1.167(a)–7(a), Income Tax Regs., permitting depreciable property to be treated "by combining two or more assets in a single account." Depreciation charges subsequent to January 1, 1962, upon the multiple-asset account were computed on a straight-line basis using an 11-year average useful life (in conformance with Rev. Proc. 62–21, 1962–2 C.B. 422, for chemical and allied products). The original cost of all property transferred to the straight-line, multiple-asset account on January 1, 1962, totaled $62,925,963, of which $9,955,116 constituted the original cost of the straight-line powerplant properties. Subsequent to January 1, 1962, $32,316 in original cost of powerplant tangible property which is part of the straight-line property at issue in this case, was put into the multiple-asset account.

The reserve for depreciation associated with all of the property transferred to the straight-line, multiple-asset account on January 1, 1962, was $45,865,357, of which $7,109,791 was the depreciation reserve attributable to the straight-line powerplant properties.

During the taxable years 1962 to 1964, all of the assets in the straight-line, multiple-asset account in the aggregate had allowable depreciation, using an 11-year useful life, as follows:

| | |
|---|---|
| 1962 | $5,707,488 |
| 1963 | 5,607,742 |
| 1964 | 5,499,759 |

At December 31, 1964, the original cost basis of all the assets remaining in the straight-line, multiple-asset account (after additions and retirements not pertinent to this case) was an aggregate amount of $59,090,923, and the depreciation reserve applicable to the account

was $57,553,963. During the tax year 1965, Wyandotte incurred additional depreciation charges with respect to the assets in the straight-line, multiple-asset account, and said account then became fully depreciated.

On December 18, 1965, Wyandotte sold the straight-line powerplant properties to Detroit Edison Co. for the aggregate value of $2,676,523. At that time, the total original cost of all the tangible personal property associated with the powerplants was $11,474,511 of which $9,987,432 represented the total original cost of the straight-line properties ($9,955,116 attributable to straight-line properties acquired prior to January 1, 1962, and $32,316 to such properties acquired thereafter). At the time of the sale, the straight-line powerplant properties were fully operative and being used for Wyandotte's business. After the sale the two electric powerplants were owned and operated by Detroit Edison Co. in the same location as when owned by Wyandotte. Wyandotte purchased steam and electric power from these plants for use in its business after the sale to Detroit Edison Co. The bill of sale transferred "all and singular the buildings and steam and electrical generating facilities at its North Works and South Works both situated in Wyandotte, Michigan, together with related electrical facilities, tie cables, reactors, switchgear and transformers plus certain coal handling facilities on the premises being leased by Wyandotte to Edison and the electric cables between the two plants." The purchase price was $850,000 for the buildings and $3,150,000 for machinery and equipment. The bill of sale did not otherwise allocate the purchase price among the individual items of property transferred.

Shortly after the sale, at petitioner's behest, an organization known as the American Appraisal Co. made an appraised allocation of the purchase price among the items sold. A letter from the appraisal company attached to the appraisal report set forth the basis on which the allocation was made:

FEBRUARY 15, 1966

WYANDOTTE CHEMICALS CORPORATION
*Wyandotte*
*Michigan*
Attention: Mr. A. J. Dentzer
GENTLEMEN:

In accordance with your authorization, we have conducted studies to distribute the sale price of power plant property that was sold on December 17, 1965. A list of property items sold and the sale price of $3,150,000 for the entire group of assets on the list, was supplied to us by you. The property items included on the list are located at the Company's North and South Power Plants in Wyandotte, Michigan. The classes of property involved are for steam and electric generation and distribution and water supply. The property involved and the associated sale price are limited to machinery and equipment items.

The procedure used in our study was to accept the IBM listing of property as supplied to us as a working base. This list contains a description of the property

item, its original cost, its year of installation, and other identifications for property control purposes. Property inspections were made in the field for the purpose of testing the accuracy of the record and to determine the overall condition and physical depreciation associated with the property. The accounting records were checked to test the accuracy of the original cost and date of installation information. On the basis of these investigations, the property information which was supplied to us is considered to be reliable for the purposes of this study. Corrections to the original list, as supplied to us, are detailed in an attachment designated as List "A."

The $3,150,000 sale price for the entire list of assets was distributed to the individual items on the basis of estimated reproduction cost new less depreciation. The estimated reproduction cost new was obtained by trending the recorded original cost by subaccount groups to current cost levels by the application of appropriate index numbers. The estimated reproduction cost new less depreciation calculation reflects the estimated reproduction cost new in combination with the expired and estimated remaining life of the property, our field observations, and our knowledge of this type of property. The depreciation assigned considers all factors, except economic considerations. The reproduction cost new less depreciation base for distribution of the $3,150,000 assumes that the property will continue in use and that the economic gain associated with the property through continued use would properly relate to the $3,150,000 supplied to us. The distribution of the sale price has been within one class of property, machinery and equipment, and considers that the property items within this classification have similar depreciation characteristics.

Attached to this letter is one IBM listing showing the property items by tag number, general description, and, in the right hand column, an allocated amount as a proportion of the $3,150,000. The $3,150,000 lump sum has been distributed to individual items in accordance with the procedure described above.

We have made no investigation of and assume no responsibility for title to, nor any liabilities against the property studied.

Very truly yours,
(S) R. E. Jensen
*Exec. Vice President & Treasurer*
*The American Appraisal Company*

R.E. Jensen/ch
Attachment

The appraisal report itself has been placed in the record but need not be incorporated here. The parties may refer to it as appropriate in accordance with our decision herein.

The adjusted basis for purposes of determining gain upon sale of the straight-line powerplant properties was determined by Wyandotte to be $900,668. This adjusted basis was determined by taking the original cost of each individual item of the straight-line properties and subtracting from it: (1) The amount of actual depreciation deducted for each asset for the period prior to January 1, 1962, and (2) an amount for depreciation subsequent to January 1, 1962, determined at the rate that would have been proper had each asset constituting the straight-line properties been depreciated in a single-asset account for

3 years under a straight-line method using an 11-year useful life. The gain was computed by deducting the adjusted basis as determined above from the allocated value of the assets sold. Such allocated value was determined by petitioner in accord with the appraisal report noted *supra*.

On its tax return for 1965, Wyandotte reported as taxable income the proceeds of $2,676,523 received from the sale of the straight-line properties less $900,668 representing remaining tax basis attributable to such properties. Gain on the sale of $1,775,854 was reported on Wyandotte's tax return for 1965, $904,509 as long-term gain from the sale of depreciable business property under section 1231, and $871,345 as gain from recaptured depreciation under section 1245.

The amount treated as depreciation recapture under section 1245 was determined by Wyandotte with respect to each individual asset sold to be the lesser of (1) the amount of depreciation attributable to each asset sold for the period January 1, 1962, to December 18, 1965, determined as *supra*, or (2) the amount of gain realized upon its sale.

On audit of petitioner's tax return for 1965, respondent determined that at the time of sale of the straight-line properties Wyandotte had sustained additional depreciation charges of $900,668 during 1965 upon those properties. Respondent thus increased Wyandotte's deduction for depreciation in 1965 by that figure and made a corresponding increase in the total amount of gain realized by Wyandotte upon the sale of the straight-line properties, bringing the total gain from $1,775,854, as reported, to $2,676,523, as adjusted.[2]

Respondent further determined that the total adjusted gain of $2,676,523 constituted depreciation recaptured and taxable under section 1245.

OPINION

This case concerns recapture of depreciation claimed for the taxable years 1962 through 1965 on items of tangible personal property contained in a multiple-asset account, which were transferred by petitioner's predecessor corporation, Wyandotte Chemicals Corp. (Wyandotte), to Detroit Edison Co. in 1965 in a sale of two steam and electricity-generating facilities used in its business.

The issues involved are (1) whether petitioner was entitled to compute depreciation recapture (section 1245 gain) separately for each of the 1,500 items that were component parts of the powerplants, or whether the items were to be treated as one aggregate property for recapture purposes; (2) whether, if the former, recapture on items owned by petitioner as of December 31, 1961, is limited to their adjusted bases

---

[2] Petitioner conceded these adjustments.

on that date; and (3) whether petitioner has carried its burden of proving an acceptable allocation of the lump-sum sale price of the individual assets involved.[3]

Most of the items here involved had been acquired by Wyandotte before January 1, 1962, and had been depreciated in individual, straight-line accounts before being placed in the multiple-asset account on that date; the others entered the group account subsequently. By the time of sale in 1965, the multiple-asset account had been fully depreciated.

The total original cost of the straight-line properties that were put into the multiple-asset account at the beginning of 1962 was $9,955,116. The aggregate of the depreciation against these properties as of December 31, 1961, was $7,109,791 leaving an aggregate adjusted basis in these properties of $2,845,145 at December 31, 1961. To this must be added additional properties acquired after December 31, 1961, at a cost of $32,316 which were placed in this account. This would give an aggregate undepreciated basis in the properties with which we are concerned of $2,877,461. It is stipulated that all the straight-line properties were fully depreciated at the time of the sale and that they were sold for an aggregate sale price of $2,676,523. An 11-year life was established for the multiple-asset account, producing a 9.09-percent annual rate of depreciation. In computing allowable depreciation on the assets [4] in the account after December 31, 1961, this percentage was applied to the original cost of all assets in the account to determine the amount of depreciation allowable each year. If we ignore any retirements during the period December 31, 1961, to date of sale in 1965, the total percentage of the original cost that would have been allowable as depreciation on this account was 29.87 percent (9.09 for 3 years plus 2.6 percent for 1965), or a total dollar amount of $2,983,246. This, of course, exceeds the undepreciated basis in the straight-line properties as of the beginning of the period. Respondent concedes that in computing the "recomputed basis" of these properties under section 1245(a)(2) the amount to be added to the adjusted basis for depreciation allowable after December 31, 1961, is the undepreciated basis of these properties at the time they entered the multiple-asset account, totaling $2,877,461.

While there may be some disagreement between the parties as to the rate of depreciation that should be used in determining the amount of depreciation attributable to the assets after they are placed in the multiple-asset account,[5] this is not an issue in this case because it is

---

[3] Hereinafter the items in question will be referred to as the straight-line properties.
[4] For convenience the term "assets" may be used to refer to "properties" throughout this opinion.
[5] See Rev. Rul. 74-114 for respondent's explanation of how the rate should be computed.

agreed that all of the assets with which we are concerned were fully depreciated at the date of sale. The crux of the dispute between the parties is whether in computing section 1245 gain on the package sale of the approximately 1,500 straight-line assets contained in the account, we should make the computation as though the sale was of a single asset or of each of the 1,500 items separately. If we conclude that the computation must be made with respect to each of 1,500 separate items, we then have an issue as to the allocation of the aggregate sale price to each of the individual assets, because the sale price of a section 1245 asset is also a limiting factor in the computation of the recapturable depreciation.

The pertinent parts of section 1245 are set out in the footnote.[6] In substance, subsection (a) (1) provides, for our purposes, that if section 1245 property is disposed of after December 31, 1962, by sale, the amount by which the lower of the "recomputed basis" of the property and the "amount realized" on the sale of the property exceeds the adjusted basis of the property at the time of sale shall be treated as

---

[6] SEC. 1245. GAIN FROM DISPOSITIONS OF CERTAIN DEPRECIABLE PROPERTY.

  (a) GENERAL RULE.—

    (1) ORDINARY INCOME.—Except as otherwise provided in this section, if section 1245 property is disposed of during a taxable year beginning after December 31, 1962, the amount by which the lower of—

    (A) the recomputed basis of the property, or

    (B) (i) in the case of a sale, exchange, or involuntary conversion, the amount realized, or

      (ii) in the case of any other disposition, the fair market value of such property,

exceeds the adjusted basis of such property shall be treated as gain from the sale or exchange of property which is neither a capital asset nor property described in section 1231. Such gain shall be recognized notwithstanding any other provision of this subtitle.

    (2) RECOMPUTED BASIS.—For purposes of this section, the term "recomputed basis" means—

    (A) with respect to any property referred to in paragraph (3) (A) or (B), its adjusted basis recomputed by adding thereto all adjustments, attributable to periods after December 31, 1961,

  *        *        *        *        *        *        *

reflected in such adjusted basis on account of deductions (whether in respect of the same or other property) allowed or allowable to the taxpayer or to any other person for depreciation * * *. For purposes of the preceding sentence, if the taxpayer can establish by adequate records or other sufficient evidence that the amount allowed for depreciation * * * was less than the amount allowable, the amount added for such period shall be the amount allowed.

    (3) SECTION 1245 PROPERTY.—For purposes of this section, the term "section 1245 property" means any property (other than livestock) which is or has been property of a character subject to the allowance for depreciation provided in section 167 and is either—

    (A) personal property, or

    (B) other property (not including a building or its structural components) but only if such other property is tangible and has an adjusted basis in which there are reflected adjustments described in paragraph (2) for a period in which such property (or other property)—

      (i) was used as an integral part of manufacturing, production, or extraction or of furnishing transportation, communications, electrical energy, gas, water, or sewage disposal services, or

      (ii) constituted research or storage facilities used in connection with any of the activities referred to in clause (i), * * *

gain from the sale of a noncapital asset. Subsection (a)(2) defines "recomputed basis" as the adjusted basis of the property plus all allowed or allowable depreciation attributable to the property after December 31, 1961, which is reflected in the adjusted basis of the property. The "amount realized" on the sale is the amount of gain, i.e., sales price less adjusted basis. Subsection (3) defines section 1245 property, and there is no dispute that the properties here involved qualify as such. In light of the fact that the adjusted basis of these properties was zero at the time of the sale, it becomes clear that the amount of the gain on the sale that must be reported as ordinary income, or recapture of depreciation, under section 1245 is the lower of the amount realized on the sale and the amount of depreciation allowed or allowable with respect to the property sold after December 31, 1961, which is reflected in the property's adjusted basis.

Petitioner argues that in determining both gain and the "recomputed basis," the amount of depreciation that can be attributed to the assets during the period 1962–65 must be computed with respect to each of the 1,500 assets individually on a single-asset basis; and that this amount is limited to the undepreciated cost of the individual asset at the time it was placed in the multiple-asset account. If the allowable depreciation is so computed, the allowable depreciation on many of the individual assets after 1961 will be less than the gain attributable to those individual assets, because many of the assets were fully depreciated at the time they were put into the account, and no additional depreciation could be attributed to them. Also, the "amount realized" on the sale of a specific asset may be less than the "recomputed basis" (which in this instance would be the depreciation allowed with respect to that asset after December 31, 1961), and the "amount realized" would thus be the limiting factor in determining section 1245 gain.

Respondent argues that when the straight-line properties were put into the multiple-asset account, they lost their individual identities, and since the aggregate gain on the sale, in the amount of $2,676,523, was less than the aggregate depreciation allowed on these properties during the period, the entire gain must be treated as ordinary income, or section 1245 gain.

Section 1245(c) authorizes the Secretary to prescribe such regulations as he deems necessary to provide for adjustments to the basis of property to reflect gain recognized under subsection (a). In section 1.245–1(a)(1), Income Tax Regs., it is stated that "The amount of such [section 1245] gain shall be determined separately for each item of section 1245 property." Section 1.1245–2(a)(6), Income Tax Regs., refers to regulation section 1.167(a)–8(c)(3) for principles of deter-

mining the amount of adjustments for depreciation reflected in the adjusted basis of property upon an abnormal retirement of property in a multiple-asset account.

Section 1.167(a)–8 of respondent's regulations relates to the gain and loss on retirement of assets, and subsection (c)(3) relates to the basis for determining gain or loss upon the abnormal retirement of assets from a multiple-asset account. The relevant parts of the regulation are quoted in the footnote.[7] There is no dispute that the sale of the straight-line properties qualifies as an abnormal retirement as defined in subsection (b) of the regulation. Under subsection (a) the rules of the section thus apply in determining the amount of the gain or loss that will be recognized, and the basis for determining gain or loss on the retirement of these assets from the multiple-asset account. Subsection (c) provides that the basis of assets at the time of retirement for computing gain or loss shall be their adjusted bases determined under section 1011 and the following rules. Paragraph (3) of the subsection provides a rule for computing the adjustment to basis for depreciation allowed or allowable in the case of the abnormal retirement of assets from a multiple-asset account. It provides that the adjustment shall be made at the rate which would have been proper had the asset been depreciated in a single-asset account under the method and rate of depreciation used for the multiple-asset account.

---

[7](a) * * * For the purposes of this section the term "retirement" means the permanent withdrawal of depreciable property from use in the trade or business * * *. * * * For example, the withdrawal may be made by selling or exchanging the asset * * *. * * * The tax consequences of a retirement depend upon the form of the transaction * * * and whether the asset is accounted for in a separate or multiple asset account. * * *

    *      *      *      *      *      *      *

(b) *Definition of normal and abnormal retirements.* For the purpose of this section the determination of whether a retirement is normal or abnormal shall be made in the light of all the facts and circumstances. In general, a retirement shall be considered a normal retirement unless the taxpayer can show that the withdrawal of the asset was due to a cause not contemplated in setting the applicable depreciation rate. For example, a retirement is considered normal if made within the range of years taken into consideration in fixing the depreciation rate and if the asset has reached a condition at which, in the normal course of events, the taxpayer customarily retires similar assets from use in his business. On the other hand, a retirement may be abnormal if the asset is withdrawn at an earlier time or under other circumstances, as, for example, when the asset has been damaged by casualty or has lost its usefulness suddenly as the result of extraordinary obsolescence.

(c) *Basis of assets retired.* The basis of an asset at the time of retirement for computing gain or loss shall be its adjusted basis for determining gain or loss upon a sale or other disposition as determined in accordance with the provisions of section 1011 and the following rules:

    *      *      *      *      *      *      *

(3) In the case of an abnormal retirement from a multiple asset account the adjustment for depreciation allowed or allowable shall be made at the rate which would have been proper had the asset been depreciated in a single asset account (under the method of depreciation used for the multiple asset account) and using a rate based upon either the average expected useful life or the maximum expected useful life of the asset, depending upon the method of determining the rate of depreciation used in connection with the multiple asset account.

This case appears to be one of first impression with respect to the issues before us. Rational arguments can be made for the positions taken by both parties. When a taxpayer elects to put all of his similar assets into a multiple-asset account for convenience in computing depreciation, it might seem logical to require him to allocate the depreciation allowed or allowable among all of the assets whose cost is used in computing annual depreciation, even though some of those assets were fully depreciated when they were put into the multiple-asset account. It is equally logical to say, however, that one cannot allocate depreciation to an asset which has no depreciable basis left to absorb it. Upon close analysis, we find that petitioner's position is more reasonable and more consistent with normal accounting concepts and the purpose sought to be accomplished by Congress in enacting section 1245.

Respondent argues that when assets are placed in a multiple-asset account, they lose their individual identity; the depreciation reserve of all of the individual assets placed in the account becomes the depreciation reserve for the account as a whole; depreciation thereafter is computed by applying a percentage, determined by the useful life placed on the account, to the original cost of all assets in the account; and depreciation is limited only by the adjusted basis of the account as a whole. Respondent relies on Rev. Proc. 62–21, 1962–2 C.B. 418, which, in appendix IV announced in I.R.B. 1963–38, 18, states in part:

The assets transferred to a multiple-asset account lose their identities for the purpose of computing depreciation so that the entire account, rather than the individual assets, is subject to depreciation.

However, this procedure is for determining depreciation on a multiple-asset account while the assets are in that account. It does not provide how the adjustment for depreciation must be computed with regard to assets removed from the multiple-asset account by abnormal retirement.

Respondent's theory works well and is much easier to apply to the particular circumstances under consideration, where all of the assets in the account were sold at the same time, and it is agreed that the entire account had a zero-adjusted basis at the time of the sale. But section 1245 must also be applied to different circumstances. If only one or two assets were abnormally retired from the multiple-asset account, it would be necessary in computing the amount of recapturable depreciation to first determine the amount realized, the adjusted basis, and the recomputed basis of each separate asset so retired. If the depreciation reserve of all the individual assets placed in the multiple-asset account becomes the depreciation reserve for the account as a whole, these determinations cannot be made. We think respondent's regulations and rulings recognize this when, in dealing with the retire-

ment of individual assets, they provide that in case of abnormal retirement from a multiple-asset account the adjustment for depreciation allowed or allowable shall be made at the rate which would have been proper had the asset been depreciated in a single-asset account, etc. Sec. 1.167(a)–8(c)(3), Income Tax Regs. The fact that assets placed in a multiple-asset account may lose their individual identities for purposes of computing annual depreciation does not mean that they lose their individual identities for purposes of computing gain or loss and depreciation recapture upon abnormal retirement of those individual assets from the multiple-asset account.

Section 1.167(a)–8(c), Income Tax Regs., provides that the basis of an asset at the time of retirement for computing gain or loss shall be the adjusted basis for determining gain or loss upon a sale or other disposition as determined under section 1011, and the following rules. We find nothing in the "following rules" which would change the method of computing adjusted basis under section 1011 in the event of abnormal retirement. In most instances adjusted basis is determined under section 1011 by subtracting from cost the depreciation allowed or allowable. In a single-asset account when the cost has been fully depreciated, no more depreciation is allowed or allowable, and the adjusted basis is zero. To determine the recomputed basis of the asset for purposes of section 1245, there is added to the adjusted basis the amount of the depreciation allowed or allowable with respect to the asset after December 31, 1961, which is reflected in its adjusted basis. That amount cannot exceed the remaining undepreciated cost or basis of the asset when it is put into the multiple-asset account. However, respondent's theory would do just that with regard to assets having a zero basis when placed in the account. It would necessitate either allocating a part of the basis of other assets in the multiple-asset account to those assets having zero bases or reducing the adjusted bases of those assets to a minus figure.[8] We find no justification for or a need to do either under section 1245. This would not be proper if the depreciation allowed or allowable on the asset being abnormally retired was being computed as though it was in a single-item account.

Section 1245(a)(2) defines the term "recomputed basis" as the adjusted basis recomputed by adding thereto all adjustments, attributable to periods after December 31, 1961, *reflected in such adjusted*

---

[8] See discussion of whether property can be given a negative basis, in this Court's opinion in *Jack L. Easson,* 33 T.C. 963 (1960), and the opinion of the Court of Appeals for the *Ninth* Circuit in reversing the Tax Court, 294 F. 2d 653 (C.A. 9, 1961). We need not resolve the conflict here. As a practical matter in this context, if additional depreciation is attributed to an asset having a zero basis when it is put into the multiple-asset account, so that the individual asset has a negative basis, the "recomputed basis" of that asset would be zero and thus all gain realized on the sale of that asset would be capital gain.

*basis* on account of deductions allowed or allowable to the taxpayer for depreciation. If, as contended by respondent, when a number of assets are placed in a multiple-asset account, the aggregate adjusted bases of all of the assets becomes the adjusted basis of the account as a whole, then when an individual asset is abnormally retired, it would have no adjusted basis in which such depreciation deductions could be reflected. Or if, for purposes of the computation, the adjusted basis of the single asset at the time it is placed in the multiple-asset account is used as the starting point and if that adjusted basis was zero, no additional depreciation deductions could be reflected in the adjusted basis of that asset.

While it may appear that under petitioner's theory as applied in this case petitioners are not being charged with section 1245 gain equal to the amount of depreciation allowed with respect to the multiple-asset account subsequent to December 31, 1961, the reason is that the law limits the amount of recapturable depreciation to the amount by which the *lower* of the "recomputed basis" and the "amount realized" on the sale exceeds the adjusted basis of the property sold. If the "amount realized" or sale price of the asset sold is less than the "recomputed basis" of that asset, there will be some depreciation that was allowed on that asset after December 31, 1961, that will not be recaptured. And the fact that the original cost of a fully depreciated asset placed in the multiple-asset account is used in computing the amount of depreciation allowable on the multiple-asset account each year does not mean that additional depreciation is being allowed on the fully depreciated asset; it simply means that the cost or adjusted basis of those assets which were not fully depreciated when placed in the account is being amortized or depreciated more rapidly than if depreciated in a single-asset account.

We conclude, as urged by petitioner, that when a number of section 1245 properties are abnormally retired by individual sale from a multiple-asset account, the portions of the gain realized on the sale or other disposition that will be taxed as ordinary income, or section 1245 gain, should be computed with respect to each individual property, where possible, and that the section 1245 gain attributable to any individual property retired is limited to its adjusted basis at the time it is placed in the multiple-asset account.

However, this does not necessarily provide the answer to the issue here involved. We are also of the opinion that if all of the section 1245 properties in the multiple-asset account are sold in one transaction under circumstances that indicate the parties regarded the property sold as a single integrated asset, and it is also impossible to determine with any certitude an appropriate allocation of the sales

price among the component parts so that it would be impossible to determine the gain realized on the sale of the individual properties, it is proper for respondent to determine the section 1245 gain on the sale by treating all of the properties sold as one item with one aggregate adjusted basis and recomputed basis, limited, however, to the aggregate of the adjusted bases of all the properties when they are put into the multiple-asset account after December 31, 1961.

The remaining issue thus becomes whether the sale of the two powerplants to Detroit Edison Co. was a single transaction, the sale of a single asset, or was a sale of each of the component parts of the powerplant; and if the latter, whether there is sufficient evidence in the record to permit an allocation of the sale price to each of the component parts.

The only evidence of the character of the transaction that we have is a bill of sale between Wyandotte and Detroit Edison. By the terms of that document, for and in consideration of $4 million to it paid by Edison, of which $850,000 was for buildings and $3,150,000 was for machinery and equipment, Wyandotte granted and conveyed to Edison all of the buildings and steam and electrical generating facilities at its North Works and South Works in Wyandotte, Mich., "together with related electrical facilities, tie cables, reactors, switchgear and transformers plus certain coal handling facilities on the premises * * * and the electric cables between the two plants and including (but not by way of limitation) items on the 'Schedules to Bill of Sale' which are hereto attached and made a part hereof." No schedules were attached to the bill of sale document offered as an exhibit. On the face of it the bill of sale suggests that the transaction was a sale of two powerplants, with an allocation of the sale price only between the buildings and the machinery and equipment. There is no evidence that the parties intended any other type of transaction or that a further allocation of that part of the sales price allocated to machinery and equipment was intended to be made. Nor is there any evidence that the bill of sale did not represent the substance of the transaction between the parties. This is not a case where the evidence gives the Court reason to believe that the substance of the transaction was any different than evidenced by the document used to make the transfer and sale.

At the opening of the trial there appeared to be some misunderstanding between counsel for the parties as to the respective theories they were relying on, which the Court was unable to resolve entirely, but counsel for petitioner was aware of the fact that respondent had treated the transaction as the sale of a single asset and that the burden was on petitioner to offer evidence to rebut the presumption of correct-

ness of respondent's determination, particularly in light of the bill of sale. This petitioner did not successfully do.

Section 1.1245–1(a)(5), Income Tax Regs., provides that in case of a sale of section 1245 and non-section 1245 property in one transaction, the total amount realized upon the disposition shall be "allocated between the section 1245 property and the non-section 1245 property in proportion to their respective fair market values." If the buyer and seller have adverse interests as to the allocation of the amount realized between the section 1245 and non-section 1245 properties, any arm's-length agreement between the buyer and seller will establish the allocation. In the absence of such an agreement, the allocation shall be made by taking into account the appropriate facts and circumstances, such as the cost and reproduction cost, the remaining economic useful life, etc.

While the above paragraph of the regulations recognizes the *necessity* of allocating sales price between section 1245 property and non-section 1245 property where both are sold in one transaction, and methods for making the allocation where it has not been made by the buyer and seller, this does not mean that an arbitrary allocation of the sales price between the section 1245 assets alone can be made by the seller for section 1245 purposes. Furthermore, we do not believe the cases which have permitted allocation of sale price even though no allocation was made in the sales contract are apposite here. See, for example, *Helvering* v. *Taylor*, 293 U.S. 507 (1935); *Commissioner* v. *Ferrer*, 304 F. 2d 125 (C.A. 2, 1962), reversing in part 35 T.C. 617 (1961); *First Pennsylvania Banking & Trust Co.*, 56 T.C. 677 (1971). In those cases there were different types of properties involved; here, they are all section 1245 properties.

But even if it was agreed that the transaction was intended to be a sale of the 1,500 individual assets contained in the straight-line properties account, we do not have competent evidence that would provide an acceptable basis for allocating the lump-sum sale price among the various components. The petitioner offered the report of an appraisal company which had been employed by Wyandotte in the early part of 1966 to conduct studies to distribute the sale price of powerplant property that was sold on December 17, 1965; and the testimony of an accountant who testified how the section 1245 gain had been computed for Wyandotte's 1965 tax return, based on the appraisal report. The appraisal report indicated that a list of the property items sold and the sales price of $3,150,000 had been supplied by Wyandotte. The report states that:

The $3,150,000 sale price for the entire list of assets was distributed to the individual items on the basis of estimated reproduction cost new less depreciation. The estimated reproduction cost new was obtained by trending the recorded

original cost by subaccount groups to current cost levels by the application of appropriate index numbers. The estimated reproduction cost new less depreciation calculation reflects the estimated reproduction cost new in combination with the expired and estimated remaining life of the property, our field observations, and our knowledge of this type of property. The depreciation assigned considers all factors, except economic considerations. * * *

Without some further explanation, which we do not have, we are not even certain that the approach used by the appraiser properly reflects the relative values of the various assets involved nor an acceptable method of allocating sales price. But absent some evidence that the parties to the transactions intended that an allocation of the sales price be made and agreed that such an appraisal approach be used to make the allocation, we cannot accept this evidence as prima facie proof of the proper allocation of the lump-sum sales price.

Where the issue before the Court is to determine the amount of the gain on sale of section 1245 property that is section 1245 gain and the amount that is capital gain, the actual sales price of the assets involved is vitally important because it is one of the limiting factors in determining the amount of section 1245 gain, as it undoubtedly was here. Section 1245 (a) (1) (B) uses the language:

(i) in the case of a sale, exchange, or involuntary conversion, the amount realized, or

(ii) in the case of any other disposition, the fair market value of such property,

This was clearly a sale and the "amount realized" on the sale of the property is a limiting factor, not the fair market value as would be the case in the event of "any other disposition" of the property. In our opinion a mechanically reconstructed fair market value of the section 1245 assets is not an acceptable basis, under the circumstances here present, upon which to allocate the lump-sum sales price of the straight-line properties among the 1,500 components thereof.

Under these circumstances, we must sustain respondent's determination on this issue, as modified by his concessions. Section 1.1245–1 (a) (4), Income Tax Regs., provides that a *taxpayer* may treat any number of units of section 1245 property in any particular depreciation account as one item of section 1245 property, as long as it is reasonably clear that the amount of section 1245 gain is not less than the total of the section 1245 gain computed separately for each unit. We recognize that the provision refers only to "a taxpayer"; but we see no reason the same principle should not be used by the Commissioner when there is no adequate basis upon which to accurately compute the section 1245 gain on each individual asset sold in a single transaction for a lump-sum price. In this case it would appear that using the above method would not result in recapture of more depreciation than had been

720

allowed petitioner on these straight-line properties because the lump-sum sale price was less than the depreciation allowed and becomes the limiting factor.

*Decision will be entered under Rule 155.*