BUFFALO TOOL & DIE MANUFACTURING CO., INC., TRANSFEROR, PETER HOSTA, JR., AND ELEANOR HOSTA, TRANSFEREES, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 6553–77.     Filed May 27, 1980.

*Paul R. Comeau* and *Victor T. Fuzak*, for the petitioners.
*Louis J. Zeller, Jr.*, for the respondent.

TANNENWALD, *Judge:* Respondent determined a deficiency in the corporate income tax for 1973 of the transferor, Buffalo Tool & Die Manufacturing Co., Inc. (hereinafter Buffalo Tool or the corporation), of $403,541, based upon adjustments for depreciation recapture under section 1245.[1] He determined that petitioners Peter Hosta, Jr. (hereinafter Hosta), and Eleanor Hosta are liable as transferees of Buffalo Tool as follows:

Hosta........................$403,541.00
Eleanor Hosta..............267,811.88

By amendment to answer, respondent redetermined the transferor's deficiency to be $653,979.64 and asserted a transferee

_____

[1] All section references are to the Internal Revenue Code of 1954 as amended and in effect during the taxable year at issue.

liability against Hosta in that amount; he also increased the asserted transferee liability against Eleanor Hosta to $323,000.[2] At trial, the Court severed certain issues relating to the allocation of the overall purchase price to individual pieces of machinery.[3] The issues presented herein for resolution are whether, on the basis of the record thus far developed, (a) Buffalo Tool's allocation of the purchase price should be binding upon respondent, (b) the sale of the machinery should be treated as a bulk sale for purposes of applying the depreciation recapture provisions, and (c) respondent's allocation of the purchase price, which was based upon applying a percentage factor to the amounts received by the purchaser on subsequent resales of the machinery, should be binding upon petitioners.

## FINDINGS OF FACT

The individual petitioners resided in Athol Springs, N.Y., at the time the petition herein was filed. During 1973, Buffalo Tool was a corporation organized under the laws of the State of New York with its principal place of business in Buffalo, N.Y. It filed its income tax return for 1973 with the North Atlantic Service Center, Andover, Mass., on March 4, 1974.

Hosta founded Buffalo Tool in 1942. During 1973, he owned 86.32 percent of the stock of Buffalo Tool; Eleanor Hosta owned the remaining 13.68 percent. Hosta served as its president, Eleanor Hosta as its secretary, and Floyd G. Wehrlin was the vice president. The board of directors consisted of Hosta, Eleanor Hosta, and Geoffrey Hosta. Buffalo Tool's primary business was the manufacture of tools and dies to be used in automotive production. During 1972, Hosta decided to discontinue the business of the corporation. He first attempted to sell Buffalo Tool as a going business, placing advertisements in the Wall Street Journal. Such efforts proved unsuccessful, so he concentrated on selling the machinery of the corporation, together with the land and building whereon the machinery was located, which was owned by the individual petitioners.

Hosta was unwilling to sell the building and land separate

---

[2] The individual petitioners concede the amounts that they received from Buffalo Tool and that they were transferees, so that only the amount of the transferor's liability is in dispute.

[3] As used herein, "machinery" includes tools and miscellaneous personal property.

from the machinery, because he thought it impractical to move the machinery and store it for the period of time that might be necessary to get a fair price for it. He refused to sell the machinery piecemeal, because he feared any piece he might sell would be the key to a sale of a larger, or even the entire, lot.

During the late summer of 1972, Hosta was approached by a group of prospective purchasers, who eventually purchased the machinery and the realty. The primary business of the members of this group (hereinafter the syndicate or purchasers) was the purchase and resale of used machinery. Some members of the syndicate examined the machinery at that time but rejected the asking price as too high. Hosta provided them with an inventory list of the machinery without any prices for individual items contained therein.

During the first quarter of 1973, the syndicate again became interested in acquiring the property. Meetings were held between Hosta and representatives of the syndicate, including Joseph and Bill O'Connell of O'Connell Machinery Co., Leonard Morey of Morey Machinery Co., and Harold Goldstein of Cadillac Machinery Co. Harold Goldstein conducted the negotiations on behalf of the syndicate. Hosta rejected an offer by the syndicate to simultaneously purchase the real estate in one name and the machinery in another, requiring them to take the whole package as one buyer.

On March 16, 1973, Hosta and the syndicate reached agreement on a sales price of $2,600,000 for the machinery and $350,000 for the land and building, or $2,950,000 in total.[4] No further negotiations were conducted regarding either the sales price or the allocation of the price.

On March 21, 1973, Buffalo Tool's board of directors met and resolved to sell substantially all of the corporation's assets and adopted a plan to liquidate the corporation within 12 months. That evening, the individual petitioners and Buffalo Tool as sellers and David J. Kayner (hereinafter Kayner) as nominee for the purchasers[5] signed an agreement for the sale of all of the

---

[4]The petitioners and respondent are in agreement that $350,000 is attributable to the land and building.

[5]Kayner, an attorney, drafted a proposed sales contract for the purchasers and negotiated some of the nonfinancial aspects of the transaction on their behalf.

assets of Buffalo Tool (except cash and office furniture), together with the land and building.

Prior to the signing of the agreement, while the final draft was being retyped, Hosta's attorney presented Kayner with a letter, for his signature, stating that the parties agreed to an allocation of $350,000 to the land and building and of $2,600,000 to the personal property, as was set forth in the attached schedule. The schedule included an inventory of the major machinery items, with alleged sales prices (allegedly equal to fair market value) for each item.[6] Goldstein told Kayner to sign the letter. Kayner did so only after calling his law office in Chicago, which made sure that the allocations would not be inconsistent with their accountant's projected allocations. The letter and attached schedule had been presented to neither Kayner nor any member of the syndicate prior to the closing. Prior to this time, the only discussions between the parties regarding individual prices had been to test the overall sales price.

Hosta had prepared the schedule of individual pieces for his attorney prior to the reaching of a preliminary agreement with the eventual purchasers. The allocation was based on Hosta's estimate of the fair market value of each item, given its condition, demand for it, the current price of new machinery, and the length of time required for a similar new machine to be delivered. He obtained no independent appraisals of the individual pieces at that time. When the parties negotiated the $50,000 reduction in total price, Hosta reduced the prices allocated to the cranes and perishable tubes by that amount.

Industrial Plants Corp., a member of the syndicate, undertook to conduct an auction sale of the machinery for the syndicate. An auction of most of the machinery was held on June 7, 1973, at the location of Buffalo Tool. Between 250 and 300 prospective buyers attended the auction. The machinery was sold as is, where is. Buffalo Tool had allocated no portion of its sales proceeds to miscellaneous items of machinery and equipment

---

[6]The schedule also listed several other miscellaneous items without any indication of the alleged sales prices attributable thereto. See also n. 14 *infra*.

which later provided the majority of the number of pieces sold at the auction.[7]

Several items of machinery were not offered for sale at the auction but were instead sold separately in "liquidation sales" by members of the syndicate to unrelated third-party purchasers. Seventeen pieces of machinery were sold in this manner. Five of these machines were sold in June 1973; seven later in the year, four in 1974, and one in 1976.

Respondent does not challenge the bases and amounts of depreciation for the machinery as reported on Buffalo Tool's 1973 corporate income tax return.

OPINION

Section 1245(a) requires ordinary income treatment, upon the disposition of property, of that portion of the amount realized exceeding an item's basis, limited by the depreciation taken on the item after December 31, 1962, even where a section 337 liquidation is involved, and petitioners have not argued otherwise.[8] *Clayton v. Commissioner*, 52 T.C. 911 (1969). Thus, the ultimate issue herein is how the total purchase price of $2,600,000 for the machinery is to be allocated in order to calculate the section 1245 recapture.

In an attempt to facilitate the resolution of this case, the Court severed the issue related to the valuation of the individual items of machinery from the issue of the allocation of the overall purchase price to such individual pieces. At the moment, therefore, we are concerned only with the legal issues as to whether, on the basis of the record thus far developed, (a) petitioners' allocation of the purchase price set forth in the March 21 letter should be held to be binding upon the respondent, (b) the sale of the machinery should be treated as a bulk sale for purposes of the depreciation recapture provisions, or (c) in any event, respondent's allocation of the purchase price, derived by the application of a formula equal to total purchase price divided by total amounts received at the subsequent

---

[7]Although the number of such items constituted an overwhelming majority in quantity, their yield in dollars was a very small percentage. See n. 14 *infra*.

[8]Respondent has raised no question as to the qualification of the liquidation of Buffalo Tool under sec. 337.

auction and liquidation sales, multiplied by the subsequent sales price for each individual item·at the auction or liquidation sales, should be held to be binding upon petitioners.

Petitioners argue that we should accept the allocation of the purchase price among the individual pieces of machinery because it was the product of arm's-length negotiations between adverse parties, both parties intended the tax consequences of the transaction to be binding, and respondent has not presented "strong proof" that the allocation lacks economic reality, citing as support for their position *Ullman v. Commissioner*, 264 F.2d 305 (2d Cir. 1959), affg. 29 T.C. 129 (1957), *Lutz v. Commissioner*, 45 T.C. 615 (1966), revd. on other grounds 396 F.2d 412 (9th Cir. 1968), and *Resler v. Commissioner*, T.C. Memo. 1979–40.[9] Petitioners are mistaken both on the law and on its application to the facts in this case.

The burden of proof is on the petitioners. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioners misconceive the juxtaposition of the "strong proof" standard and the location of the burden of proof. That standard merely states that when a taxpayer who is a party to an agreement seeks to disavow an allocation set forth in an agreement, *he* is bound by that allocation unless *he* produces "strong proof" that the allocation was not bargained for or that it had no business significance or economic reality. It was in this context that the standard was applied in the cases relied upon by petitioners. See also *Schulz v. Commissioner*, 294 F.2d 52 (9th Cir. 1961), affg. 34 T.C. 235 (1960); *Lazisky v. Commissioner*, 72 T.C. 495, 501–502 (1979); *Schmitz v. Commissioner*, 51 T.C. 306, 318 (1968), affd. sub nom. *Throndson v. Commissioner*, 457 F.2d 1022 (9th Cir. 1972).

The "strong proof" standard simply does not apply in the instant case. The fact that it is the respondent who is challenging the contractual allocation does not shift the burden of proof,[10] which remains with the petitioners. Nor does it affect

---

[9]Petitioners do not rely on the even stricter than "strong proof" standard enunciated in *Commissioner v. Danielson*, 378 F.2d 771 (3d Cir. 1967), revg. and remanding on this issue 44 T.C. 549 (1965). That case specifically recognized that such stricter standard was not applicable to respondent (see 378 F.2d at 774–775) and, in any event, the *Danielson* standard has not been adopted by this Court. See, e.g., *Spector v. Commissioner*, 71 T.C. 1017, 1023 n. 6 (1979), on appeal (5th Cir., Oct. 3, 1979).

[10]Petitioners rely on *Lutz v. Commissioner*, 45 T.C. 615, 635 (1966), revd. on other grounds 396 F.2d 412 (9th Cir. 1968), for the proposition that respondent must present "strong proof" before

the tests which the courts utilize, namely, whether (a) the contractual allocation has "some independent basis in fact or some arguable relationship with business reality such that reasonable [persons], genuinely concerned with their economic future, might bargain for such an agreement," in which event, the allocation will generally be upheld (*Schulz v. Commissioner*, 294 F.2d at 55), or (b) the allocation by the buyer and the seller of a lump-sum purchase price is unrealistic, which neither the respondent nor this Court is bound to accept (*Rodman v. Commissioner*, 542 F.2d 845 (2d Cir. 1976), affg. on this issue a Memorandum Opinion of this Court; *F. & D. Rentals, Inc. v. Commissioner*, 44 T.C. 335, 345 (1965), affd. 365 F.2d 34 (7th Cir. 1966)).

In determining which test to apply herein, we first look to the circumstances under which the allocation letter was signed. The allocation was presented to Kayner as a fait accompli at the closing; if he did not sign, the deal would collapse. It had never been discussed during the negotiations for the sale. The purchasers were not concerned with the allocation, and it would have had little, if any, effect upon them;[11] they planned to resell the assets in the ordinary course of their business of purchasing and selling used machinery, with the result that any gain or loss which arose would be ordinary gain or loss.[12] See *F. & D. Rentals, Inc. v. Commissioner*, 44 T.C. at 344–345. In short, we cannot find, on this record, that the allocation was a result of arm's-length negotiations between adverse parties.

Moreover, we have examined the allocation itself. On its face,

---

we will set aside a specific contractual allocation. In *Lutz*, the taxpayers presented "strong evidence" that the covenants in issue were specifically bargained for and had economic significance. Given the amount of convincing evidence presented to the Court, we stated that it would have taken strong proof to overcome that evidence. The use of those words was not meant to shift the burden as a matter of law but was merely a statement of fact in that limited context.

[11]Compare *Resler v. Commissioner*, T.C. Memo. 1979–40, relied upon by petitioners, in which the parties negotiated whether to include an allocation but did not discuss the allocation itself. In *Resler*, this lack of discussion with respect to the allocation did not affect the effectiveness of the agreement because the parties had adverse interests and understood the contract. In addition, they had agreed upon its inclusion 2 weeks prior to closing.

[12]At most, the allocation would affect the timing of a small amount of income (or loss) from those items sold in a subsequent year to the extent that their projected allocations differed. The fact that Kayner consulted the purchasers' accountants proves nothing. He was merely told he could sign and, for aught that appears in the record, that advice could have simply been based on the proposition that the allocation made no difference to the purchasers.

it is suspect because those items which had largely pre–1963 depreciation were assigned higher allocations (relative to depreciation taken) than were those items with most of their depreciation after 1962. Part of this may, perhaps, be explained by rising prices for the machinery, general inflation, and the disparity expected to result when allowable depreciation exceeds the actual reduction (if any) in value. However, petitioners obtained no independent appraisal contemporaneously with the sale. Furthermore, in virtually every case where the valuation by their expert witness, Arthur Schauer, differed from petitioners' allocation, it did so against them;[13] when petitioners' allocation was lower than Schauer's value, the difference would have been subject to recapture, whereas when Schauer's value was lower, the difference would not have been subject to recapture, because either the difference was due to pre–1963 depreciation, or to a rise in the value of the item, producing an excess over recomputed basis. In both situations, the difference would have escaped taxation at the corporate level under section 337. Thus, the economic reality of this allocation is at best questionable and was, in any event, unilaterally imposed against a nonadverse (for tax purposes) party. See *BASF Wyandotte Corp. v. Commissioner*, 62 T.C. 704, 718 (1974), affd. 532 F.2d 530 (6th Cir. 1976).

Additionally, the allocation ignored a very large number of smaller items which were sold to the syndicate. Granted that most of these items may have been of minimal value relative to some of the large machines which were sold and received an allocation, when these smaller items are aggregated, they represent a nonnegligible portion of the value.[14]

In light of the foregoing, we find that the allocation relied upon by petitioners was neither realistic nor the result of arm's-length negotiations. We therefore reject petitioners' position that the allocation between the parties should be binding as a matter of law. Compare *Winn-Dixie Montgomery, Inc. v. United*

---

[13]We will not discuss respondent's witness' allocation because it is not pertinent to the legal issues presently before us.

[14]In fact, to the extent that these items (some 1,100 in number) had any value at the time of transfer, some portion of the sales proceeds should have been allocated to them. The point being made in the text is that the value of these items in aggregate (which appears to be approximately $63,000) ought not to be considered de minimis.

*States*, 444 F.2d 677 (5th Cir. 1971), with *Dakan v. United States*, 203 Ct. Cl. 655, 492 F.2d 1192 (1974). Should consideration of the issue of how the allocation should in fact be made become necessary (see pp. 451–452 *infra*), we will decide at that time whether, in spite of our reservations as to petitioners' allocation, it should nevertheless be accorded some weight.

Respondent has advanced two alternative methods for us to determine how much of Buffalo Tool's gain should be treated as recaptured under section 1245. In his amended answer, he characterized the sale of Buffalo Tool's assets as a "bulk sale," which he claims is subject to the rule set forth in *BASF Wyandotte Corp. v. Commissioner, supra.* On this issue, he has the burden of proof. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142 (a), Tax Court Rules of Practice and Procedure.

In *BASF Wyandotte*, the assets sold had been placed by the taxpayer in a multiple-asset account and had been depreciated on that basis. Respondent sought to compute depreciation recapture under section 1245 on the basis of the continued treatment of those assets as being in the multiple-asset account. We rejected respondent's position as a matter of law and indicated that depreciation recapture should be computed with respect to each individual item. See 62 T.C. at 716. We went on to state (62 T.C. at 716–717):

> However, this does not necessarily provide the answer to the issue here involved. We are also of the opinion that if all of the section 1245 properties in the multiple-asset account are sold in one transaction under circumstances that indicate the parties regarded the property sold as a single integrated asset, *and* it is also impossible to determine with any certitude an appropriate allocation of the sales price among the component parts so that it would be impossible to determine the gain realized on the sale of the individual properties, it is proper for respondent to determine the section 1245 gain on the sale by treating all of the properties sold as one item with one aggregate adjusted basis and recomputed basis, limited, however, to the aggregate of the adjusted bases of all the properties when they are put into the multiple-asset account after December 31, 1961.
>
> The remaining issue thus becomes whether the sale of the two powerplants to Detroit Edison Co. was a single transaction, the sale of a single asset, or was the sale of each of the component parts of the powerplant; *and* if the latter, whether there is sufficient evidence in the record to permit an allocation of the sale price to each of the component parts. [Emphasis added.]

We upheld respondent's computation only because the taxpayer was unable to sustain his burden of proving that the sale of the assets was the sale of each of the component parts of the

powerplant involved rather than the sale of a single asset in a single transaction, *and* because there was insufficient evidence to permit an allocation of the sale price to each of the component parts. In this latter connection, it is significant that we did not reach our conclusion as to the "impossibility" of allocation until after we had analyzed the evidence in respect thereof.[15] In short, *BASF Wyandotte* does not even stand for the proposition explicated by respondent. Moreover, that case is factually distinguishable because Buffalo Tool had no multiple-asset account but had consistently treated each item separately prior to, and at the time of, the sale to the syndicate.

In view of the foregoing, we reject respondent's "bulk sale" argument and refuse to accept his contention that we should treat all of the items sold by Buffalo Tool as a single item for purposes of depreciation recapture.

We turn now to respondent's initial reallocation upon which his deficiency notice was based. He reduced the prices received by the syndicate at the auction conducted by Industrial Plants Corp. on June 7, 1973, and the surrounding liquidation sales by a factor equal to the difference between the lump sum paid to Buffalo Tool and the total amount received by the syndicate in its subsequent sales.[16] Respondent asserts that this reduction adequately and reasonably reflects both the syndicate's profit and any inflation which may have occurred during the 2½-month period between the purchase and resale of the assets.

We are not unaware that sales prices at or about the critical date are highly relevant to determining value (*Messing v. Commissioner*, 48 T.C. 502, 509 (1967)), but we do not agree that respondent's use of these particular prices should be determinative of the issue of depreciation recapture on the basis of the existing record. We have previously rejected his attempt to employ the measuring stick of a subsequent sale's price as a divining rod. *Messing v. Commissioner*, 48 T.C. at 510. We realize

---

[15]See also *Armstrong v. Commissioner*, T.C. Memo. 1977–30 n. 6.

[16]In the case of one item, a Giddings & Lewis DiMill, which was not yet sold at the time respondent issued the notice of deficiency in 1977, he used the asking price in lieu of a sales price. The machine was subsequently sold for a lower price, and respondent concedes that that lesser amount should be used in his calculation. He has also conceded that the price for a G&L Horizontal Boring Mill by the syndicate should be reduced to reflect a limited warranty offered on that machine.

that respondent faced a difficult task in trying to value Buffalo Tool's machinery, which had been dispersed and undergone additional wear even before the corporation filed its return. Moreover, market conditions inevitably had changed, so it would have been difficult to obtain an outside appraisal of the assets' values on March 21, 1973.

Nonetheless, we disagree with respondent's conclusion that his method of valuation is necessarily determinative under the circumstances. For example, he might have sought appraisals from those most familiar with the machinery at the time of purchase, such as Goldstein, O'Connell, and Botwinik. The auction prices might then have been used for comparison.

The naked use of the auction and liquidation prices, however, is unacceptable. It ignores possible changes in market conditions affecting each asset differently and presumes that all assets had identical rates of appreciation, margins of profit (for the syndicate), and carrying costs, regardless of when sold. It effectively assumes that demand in the wholesale market for used machinery is identical to that in the "retail" market. Moreover, respondent developed his valuation by a percentage method without the aid of an expert; he provided no evidence that the foregoing assumptions were valid. Thus, while we agree that petitioners' allocation is deficient, we will not accept respondent's allocation as controlling,[17] although it will be an element to be taken into account in the event that it becomes necessary for us to face the ultimate issue of valuation.

Having resolved the severed issues by rejecting both petitioners' and respondent's allocations as necessarily controlling, we are left with only the pure factual issue, the value of each item of machinery as of March 21, 1973. As the Court repeatedly admonished counsel at trial, the issue is more properly suited for the give and take of the settlement process than adjudication. See *Messing v. Commissioner*, 48 T.C. at 512. The existing record reeks of stubbornness rather than flexibility on the part of both

---

[17]Respondent seeks to sustain his position by arguing that petitioners have not carried their burden of proof that respondent's method should not be applied. This argument is, to put it mildly, disingenuous in view of the fact that petitioners made it clear that they wanted an opportunity to cross-examine one of respondent's witnesses (Joseph O'Connell), and the Court left the record open, at least for this purpose. Such cross-examination has already taken place by way of deposition, but the Court has refrained from making the deposition part of the record, pending resolution of the severed issues.

parties, based upon "an overzealous effort * * * to infuse a talismanic precision" into their respective views as to valuation. See *Messing v. Commissioner*, 48 T.C. at 512. We are convinced that the valuation issue is capable of resolution by the parties themselves through an agreement which will reflect a compromise Solomon-like adjustment, thereby saving the expenditure of time, effort, and money by the parties and the Court—a process not likely to produce a better result. Indeed, each of the parties should keep in mind that, in the final analysis, the Court may find the evidence of valuation by one of the parties sufficiently more convincing than that of the other party, so that the final result will produce a significant financial defeat for one or the other, rather than a middle-of-the-road compromise which we suspect each of the parties expects the Court to reach. If the parties insist on our valuing any or all of the assets, we will. We do not intend to avoid our responsibilities but instead seek to administer to them more efficiently—a factor which has become increasingly important in light of the constantly expanding workload of the Court.

As to the severed issues,

*An appropriate order will be issued.*