HOOKER INDUSTRIES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HOOKER INDUSTRIES, INC. and SUPERIOR PLASTICS, INC., Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Hooker Industries, Inc. v. Commissioner
Docket Nos. 15978-79; 16195-79
United States Tax Court
T.C. Memo 1982-357; 1982 Tax Ct. Memo LEXIS 389; 44 T.C.M. (CCH) 258; T.C.M. (RIA) 82357; 3 Employee Benefits Cas. (BNA) 1849; June 24, 1982
Michael B. Arkin, for the petitioners. James M. Kamman, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION TANNENWALD, Chief Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Docket No.
Taxable year ended
Deficiency
15978-79
Dec. 31, 1970
$   2,932
Jan. 1 - June 30, 1971
67,965
June 30, 1972
149,575
16195-79
June 30, 1973
169,577
June 30, 1975
20,029
*391 The deficiency for 1973 results in part from the disallowance of a net operating loss carryback from 1974. After concessions by both parties, the following issues remain for our determination: (1) whether petitioner's [1] loans to its subsidiary, Superior Plastics, Inc., became worthless in 1975; (2) the fair market values on June 30, 1974, and June 30, 1975, of petitioner's stock contributed to its Employees Stock Ownership Plan; (3) whether petitioner may properly deduct the write-off of its administrative supplies inventory in 1974. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Hooker Industries, Inc. (Hooker), is a closely held corporation engaged in the design and manufacture of automotive and motorcycle after-market equipment. Its principal place of business is in Ontario, California. Petitioner's principal product line consists of custom-design manifold pipes called headers. [2] Other products include *392 motorcycle exhaust collectors and mufflers, street pipes, and a wide range of accessory parts. Petitioner also manufactures a line of fiberglass parts, such as spoilers and fender flares, for trucks and vans. Issue 1. Worthless Debt
In February 1973, petitioner acquired all the outstanding stock of Superior Plastics, Inc. (Superior), a manufacturer of "Marlin" fiberglass boats. During 1973 and 1974, Superior sustained substantial financial losses. By the end of December 1974, production at Superior had ceased, and, in February 1975, voluntary bankruptcy proceedings were begun. As of the date of filing for bankruptcy, Superior was indebted to petitioner in the amount of $ 839,000. Of this amount, $ 319,534.50 was secured by Superior's inventory and proceeds therefrom, accounts, contract rights, and chattel paper. Petitioner filed a claim for reclamation of security with the Bankruptcy Court. In March 1975, Superior's assets were sold *393 at auction for $ 116,000. James Lloyd, the founder of Superior and a shareholder and director of petitioner, purchased some molds and the name "Marlin Boats." Petitioner was aware of the amount generated by the auction. Petitioner's claim for reclamation of security was opposed by other creditors and a hearing was scheduled on several occasions. However, the creditors failed to pursue their objections and no hearing was ever held. Additionally, several creditors of Superior filed suits seeking to impose liability upon petitioner for the debts of Superior. Petitioner's board of directors reviewed the situation with respect to Superior at their April 2, 1975, meeting. A bad debt deduction for the entire amount loaned to Superior, $ 839,000, was taken for the year ending June 30, 1975. On July 13, 1976, petitioner received a check in the amount of $ 88,023.15 from the bankruptcy estate. Issue 2. Valuation of Petitioner's Stock
At a meeting of its board of directors on June 27, 1974, petitioner adopted an Employee Stock Ownership Plan (ESOP), effective July 1, 1973. Contributions to the ESOP were within the discretion of petitioner's board of directors. Based on the company's *394 anticipated net income for the year, the board decided upon a contribution that would provide an incentive to employees and, at the same time, would not dilute the interests of outside shareholders. The first-year contribution to the ESOP consisted of 150,727 shares of newly issued common stock and cash of $ 5,001.24. An additional 45,000 shares of newly issued common stock and a small amount of cash were contributed to the ESOP with respect to the taxable year ended June 30, 1975. No contribution was made with respect to 1976, 1979, or 1980. For the year ended June 30, 1977, petitioner contributed 19,455 shares of newly issued common stock and a small amount of cash; for the year ended June 30, 1978, 8,621 shares of newly issued common stock and a small amount of cash were contributed. The ESOP grants petitioner a right of first refusal with respect to its shares. Although not required to do so by the ESOP, petitioner has always extended to terminating ESOP participants the right to "put" (sell) their shares to petitioner at the last appraised price. [3] Petitioner actively seeks out terminated participants for the purpose of acquiring their shares. *395 The following table sets forth the purchases and sales of petitioner's stock from the adoption of the ESOP through May 1976: Date
Description
No. of shares
Price per share
4/3/75
Sale of stock by James
94,810
$ 1.213   Lloyd to 5 members of
petitioner's board of
directors
6/30/75
Stock purchased by peti-
2,914
4.77684 tioner from 81 termina-
ting ESOP participants
7/31/75
Petitioner purchased all
297,000
4.0404  of William Casler's
shares
9/30/75
Stock purchased by peti-
324
4.77684 tioner from 7 terminat-
ing ESOP participants
12/31/75
Stock purchased by peti-
328
4.138375
tioner from 5 terminat-
ing ESOP participants
3/31/76
Stock purchased by petition-
413
4.138375
er from 7 terminating
ESOP participants
5/1/76
Petitioner purchased stock
41,872
4.138375
of 20 minority share-
holders
At the time Superior was acquired by petitioner, James Lloyd was a major shareholder in, and president and general manager of, Superior. Lloyd purchased some of Superior's assets at the bankruptcy auction *396 and wanted to go back into the boat business but needed the necessary capital. To raise sufficient funds, Lloyd offered to sell his stock in petitioner for $ 1.213 per share. Pursuant to its right of first refusal, petitioner declined to purchase Lloyd's shares because it could not obtain a bank loan to pay for the stock. On April 3, 1975, Lloyd entered into a purchase and sales agreement with five members of petitioner's board of directors for the sale of the 94,810 shares. The purchase price totaled $ 115,004.53, $ 1.213 per share. The agreement stated that "Lloyd recognizes that an independent appraisal of the shares of stock on a per share basis would yield a substantially higher price per share than this Agreement contemplates." William Casler was one of petitioner's founding shareholders. When controversy arose between Gary Hooker (also a founding shareholder) and Casler, Gary Hooker decided that one of the two should sell their stock. The question of who should sell was left up to Casler. Hooker and Casler approached Ronald Gray, petitioner's vice president of finance, and asked him to arrive at a value for the stock. Gray told the two men that he would come up with what *397 he thought was a fair market value for the stock and that the seller should be willing to discount the price by ten percent. Although he realized that the company would not need to replace the services of whoever sold his stock (either Gary Hooker or Casler), Gray, in arriving at a value for the stock, did not take into account the fact that the company would be relieved of substantial compensation payments. On July 31, 1975, Casler entered into an agreement to sell his shares to petitioner for a total price of $ 1.2 million, $ 4.0404 a share. The agreement between Casler and petitioner included acknowledgements by Casler that "an independent appraisal of the shares of stock made June 30, 1974, established the value of such common stock in the amount of $ 4.77684 per share" but that "a large block of shares cannot be sold and purchased unless discounted for blockage and sold on an installment sale over a period of years." Ten percent of the purchase price was paid at the closing; the balance was evidenced by petitioner's promissory note payable over seven years at 7-1/2 percent annual interest. Petitioner at this time was paying 9 percent interest on its bank loans. As security *398 for payment of the note, the shares being purchased by petitioner and 200,000 shares owned individually by Gary Hooker were placed in escrow. The financial results of petitioner's operations were as follows: [4]
Income (after taxes)
Cost of goods
from continuing
Year
Sales
sold
operations
6/30/70
$ 3,861.279
$ 1,708,420
$ 459,252
6/30/71
4,957,004
2,615,738
504,937
6/30/72
6,288,883
3,198,684
551,435
6/30/73
6,951,643
4,164,949
354,759
6/30/74
9,324,109
5,833,814 * 203,377
6/30/75
10,125,911
6,503,938
69,520
The book value of petitioner's stock at June 30, 1974, was *399 $ 3.15 per share; at June 30, 1975, it was $ 3.19 per share. [5]
Petitioner's stock was worth $ 4.35 per share on June 30, 1974, and $ 4.138375 per share on June 30, 1975. Issue 3. Write-off of Supplies Inventory
As of June 30, 1974, petitioner wrote off its inventory of those supplies which were not materials becoming a part of the finished product manufactured for resale. The following accounts were affected by this write-off: Account Title
Amount
Office Supplies
$ 30,681.25
Engineering
8,381.53
Maintenance
17,540.60
Race Promotion
2,547.85
Tool Construction
4,731.52
San Clemente
10,863.42
Chrome
7,091.74
$ 81,837.91
On its 1974 return, petitioner took a deduction of $ 81,837.91 for the write-off of the *400 inventory. Petitioner decided to write off its supplies because it felt that inventorying those items did not conform to good industry practice and because maintaining the inventories required considerable time and effort. No physical inventory of supplies was taken in June of 1974. However, in 1976 when respondent questioned petitioner's deductions, Floyd Twede, petitioner's comptroller, physically reviewed the then existing inventories, questioned the people involved, and reviewed the annual purchases for those accounts. After this review, Twede estimated that approximately 90 days' worth of supplies were on hand at June 30, 1974. Twede estimated the cost of this 90-day supply to be $ 28,986. OPINION Issue 1. Worthless Debt
During 1973 and 1974, Hooker advanced $ 839,000 to Superior, its wholly owned subsidiary. Of this amount, $ 319,534.50 was secured by Superior's "inventory, materials, goods in process, finished goods & proceeds, accounts, contract rights, [and] chattel papers." In February 1975, Superior filed a petition in bankruptcy. Its assets were auctioned off for $ 116,000 in March of 1975. Hooker was aware of the amount received for the assets and *401 of its position as a secured creditor. In the year ended June 30, 1975, Hooker deducted as a worthless debt the $ 839,000 advanced to Superior. On July 13, 1976, Hooker received $ 88,023.15 from the bankruptcy estate. Respondent contends that, as of the end of its 1975 taxable year, Hooker's advances were only partially worthless. Accordingly, respondent disallowed $ 88,023.15 of Hooker's deduction. Petitioner argues that (1) the entire advance to Superior became worthless during the 1975 taxable year and (2) even if the debt was only partially worthless as of June 30, 1975, to the extent that respondent disallowed any portion of the debt in excess of $ 55,323.80, his actions were arbitrary and unreasonable. With respect to its first argument, petitioner, who bears the burden of proof (see Rule 142(a)), [6] has failed to establish that Superior's debt was entirely worthless as of June 30, 1975. Our review of the schedules filed by Superior in connection with the bankruptcy proceedings discloses secured debts and preferred claims, in addition to Hooker's, of $ 55,455. Simple arithmetic shows that, even if the only assets of the estate were the $ 116,000 raised by the auction, *402 and if all the other preferred and secured claims had priority over Hooker's [7] and an allowance were provided to pay legal and administrative costs of handling the estate, some portion of the $ 116,000 would have been available to Hooker. In response, petitioner argues that, because Superior was controlled by petitioner for petitioner's purposes without regard to the interests of the subsidiary, or because petitioner attempted to obtain an unfair advantage over other creditors, it was extremely unlikely that the court would recognize petitioner's secured claim. Assuming arguendo *403 that petitioner's interpretation of the bankruptcy law is correct, the record is devoid of sufficient evidence to support petitioner's position that at June 30, 1975, it looked as if the claim would be disallowed. The only testimony regarding this point is Gray's statement, "The attorneys upon preparing the documents expressed that they felt there was no chance that the bankruptcy court would honor our claim." Petitioner introduced no evidence as to the basis for that opinion. Assuming that petitioner's attorneys did in fact advise them that collection was doubtful, that fact is not sufficient to meet petitioner's burden of proof in the absence of evidence as to facts underlying that opinion. Alemite Die Casting & Mfg. Co., 1 B.T.A. 548, 551 (1925). [8] We also note that petitioner's 1975 certified financial statements claim that Superior was "a viable and independent entity since its inception." We recognize that petitioner's claim was originally opposed by Superior's creditors. That opposition, however, was never pursued to conclusion and we have no evidence as to the status of the opposition at June 30, 1975. *404 Having concluded that petitioner's debt was not totally worthless as of June 30, 1975, we must decide whether respondent abused his discretion in disallowing $ 88,023.15 of petitioner's deduction. It is well established that the decision of whether to allow a deduction for a partially worthless bad debt is one left to the sound discretion of the Commissioner.[9]Brimberry v. Commissioner, 588 F.2d 975, 977 (5th Cir. 1979), affg. a Memorandum Opinion of this Court. His determination will not be disturbed unless it is plainly arbitrary or unreasonable. Brimberry v. Commissioner, supra.[10]
Petitioner argues that as of June 30, 1975, the most it could have expected *405 to receive was $ 55,323.80. This amount was arrived at as follows: $ 116,000 (auction proceeds) - $ 5,220.92 (administrative and attorneys' fees) - $ 55,455.28 (preferred and secured claims of other creditors) = $ 55,323.80. The record in this case contains insufficient evidence to support petitioner's calculations. Despite petitioner's contentions to the contrary, it appears that secured claims of less than $ 20,000 have priority over Hooker's claim. See n. 7, supra. Thus, Hooker could have expected to receive approximately $ 90,000 from the bankruptcy estate. We have also considered the fact that in 1976 petitioner recovered $ 88,023.15 of the debt it had previously written off. Petitioner has not shown that its receipt of this amount was attributable to circumstances not reasonably foreseeable as of June 30, 1975. Cf. Minneapolis, St. Paul & Sault Ste. Marie R. Co. v. United States, 164 Ct. Cl. 226, 243-244 (1964). Thus, we hold that petitioner has not met its heavy burden of proof in respect of this issue and that respondent's disallowance of petitioner's deduction in the amount of $ 88,023.15 was not arbitrary or unreasonable. Issue 2. Valuation *406 of Petitioner's Stock
As of June 30, 1974, and June 30, 1975, respectively, petitioner contributed 150,727 and 45,000 shares of its newly issued common stock to the ESOP. [11] See section 404(a)(3). Section 404 provides that employer contributions to a qualified plan are deductible, subject to certain limitations which are not at issue here. [12] The parties agree that petitioner's deduction is measured by the fair market value of the contributed stock but disagree as to what that fair market value is. [13] The values contended for by the parties are: Value per share at
June 30, 1974
June 30, 1975
Petitioner
$ 4.77684
$ 4.138375
Respondent [14]
2.17   1.94    *407 The fair market value of petitioner's stock is "the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts." Section 20.2031-1(b), Estate Tax Regs.; section 1.170A-1(c)(2), Income Tax Regs.; United States v. Cartwright, 411 U.S. 546, 551 (1973). See generally Rev. Rul. 59-60, 1959-1 C.B. 237. [15] In determining the value of unlisted stocks, actual sales made at arm's length within a reasonable time before or after the valuation date are the best criteria of market value. Duncan Industries, Inc. v. Commissioner, 73 T.C. 266, 276 (1979). Both parties offer evidence of sales of Hooker's stock in efforts to comport with this standard. Respondent points to the Lloyd sale at $ 1.21 in support of his determination. Petitioner offers the Casler sale at $ 4.0404 and the purchases from terminating ESOP participants and other minority shareholders at $ 4.138375 to prove the value for which it contends. *408 As happens all too often in valuation disputes, the parties in this case "have convinced themselves of the unalterable correctness of their positions and have consequently failed to conclude settlement negotiations -- a process clearly more conducive to the proper disposition of disputes such as this." Messing v. Commissioner, 48 T.C. 502, 512 (1967). Contrary to what we suspect was each party's expectation when this dispute was submitted to us, we have not reached a middle-of-the-road compromise. See Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 451-452 (1980). Rather, we conclude that the fair market value of petitioner's stock was $ 4.138375 at June 30, 1975, and $ 4.35 on June 30, 1974. Our decision is based on the purchases and sales of petitioner's stock, buttressed by the 1975 valuation report of petitioner's expert and the testimony of Ronald Gray, petitioner's vice president of finance. We believe that the price at which the Casler stock was purchased and sold on July 31, 1975, is highly indicative of the June 30, 1975, fair market value of petitioner's stock. Gray, who set the price at which the sale was consummated, was *409 petitioner's vice president of finance and obviously had "reasonable knowledge of relevant facts" which would influence the price of the stock. See section 20.2031-1(b), Estate Tax Regs. That both Gary Hooker and Casler were confident that Gray would arrive at a fair price is evidenced by their decision to purchase and sell the stock at whatever price he set. This is particularly true with respect to Gary Hooker in that he agreed to let Casler decide which of them should sell at the still-to-be-determined price. Countervailing pressures operated on Gray in valuing the stock -- pressures which acted, in the aggregate, to insure that he reached a fair price. We believe it was apparent to Gray, when he was valuing the stock, that, due to the number of shares and the dollar amounts involved, the corporation would redeem the stock of the selling shareholder. Were Gray to set too high a price on the stock, the cost of purchasing the stock would operate to depress the company's future profitability. It was clearly against Gray's interests to cause such an adverse impact on the company for which he worked and in which he owned stock. [16] On the other hand, the fact that Casler, to whom *410 was left the decision of whether to buy or to sell, chose to sell indicates that the price determined by Gray was not too low. Respondent argues that the Casler price is not indicative of the stock's fair market value because Gray applied an arbitrary discount of 10 percent in arriving at the sale price and because the deferred sale was at a below-market interest rate. Gray determined a price for petitioner's stock of approximately $ 4.48 per share and indicated that the parties should agree to a 10-percent discount because of the large number of shares being sold. Assuming arguendo that respondent is correct that a discount is inappropriate in respect of the Casler sale, [17]Casler and Gary Hooker should have consummated the sale at a higher, rather than a lower, price. The note payable to Casler bore interest at 7-1/2 percent *411 and was secured by Casler's stock and a portion of Gary Hooker's stock, both of which were held in an escrow account pending payments on the note. As with the price of the stock, we believe the interest rate was determined at arm's length by the parties and reflected the risk (or lack thereof) inherent in the loan. In addition to the Casler sale, our decision is based upon the fact that petitioner purchased, and 20 minority shareholders sold, 41,872 shares of stock on May 1, 1976, at $ 4.138375 per share. The record contains no evidence that these sales and purchases were not arm's length transactions -- that the shareholders were under any compulsion *412 to sell their stock to the corporation or that the corporation was under any compulsion to purchase it. Nor does respondent argue that the May 1, 1976, transactions did not take place within a reasonable time after the 1975 valuation date. Cf. Tuck v. United States, 172 F. Supp. 890, 894-895 (N.D. Cal. 1959), affd. 282 F.2d 405 (9th Cir. 1960). Although we agree with respondent that petitioner's repurchase of a very small number of shares from terminating ESOP participants might not accurately reflect market value because petitioner would be willing to purchase a small number of shares at a higher-than-market price in order to provide support for a much larger tax deduction, we do not believe, nor do we understand respondent to argue, that this is the case with respect to the May 1, 1976, purchases and sales. In this connection, we note that the number of shares sold and purchased on May 1, 1976, was not insignificant but, rather, was very close in size to the block of shares contributed to the ESOP in 1975 (i.e., 45,000). Respondent's contentions to the contrary notwithstanding, we do not believe that the price at which the Lloyd stock sold on *413 April 1, 1975, is indicative of the stock's fair market value. As our findings of fact indicate, in March 1975, Lloyd purchased some of Superior's assets, including the name "Marlin Boats." He desired to re-enter the boat business but was experiencing financial difficulties and lacked the necessary capital. It appears that Lloyd set the price for his stock at a level which would allow him to quickly dispose of it and raise sufficient capital to cover the cost of Superior's assets and to start up his business. Using the sales of petitioner's stock made at arm's length within a reasonable time before or after the valuation date as the best criteria of market value, see Duncan Industries, Inc. v. Commissioner, 73 T.C. at 276, we conclude that the value of petitioner's stock at June 30, 1975, was $ 4.138375 per share. We believe a price slightly higher than the Casler price is reasonable, since both parties agree that the 10-percent discount Gray used for the Casler sale is inapplicable to the ESOP stock. Our conclusion as to the stock's fair market value is reinforced by the valuation report of Elly Wei, petitioner's expert witness. [18] Wei concluded that petitioner's *414 stock was worth $ 4.138375 a share at June 30, 1975, by attributing 50 percent weight to a capitalized excess earnings approach to valuation and 50 percent to a market comparison approach. The market comparison approach, in turn, was arrived at by giving 50 percent weight to a price-earnings factor, 30 per cent weight to a price-book value ratio, and 20 percent weight to the corporation's dividend-paying capacity. In her market comparison approach, Wei used five publicly traded companies as comparables. Although we have some minor disagreements with Wei's report, our differences to a large extent offset one another and we are persuaded that the value of petitioner's stock was $ 4.138375 on June 30, 1975. On the whole, we are impressed with Wei's thorough report and conclude that she gave adequate consideration to the many factors affecting the value of petitioner's stock. [19]
We now turn to the valuation of petitioner's stock at June 30, 1974. As an initial matter, respondent contends that, because petitioner introduced no expert testimony as to the value of its *415 stock on June 30, 1974, petitioner has not met its burden of proof, see Rule 142(a), and that we must uphold respondent's determination for that year. We disagree. Ronald Gray, petitioner's vice president of finance, testified to both the value he placed on the stock as of June 30, 1974, and the facts on which he based his opinion. Although Gray may not be an expert appraiser, he was intimately familiar with petitioner's financial viability and his opinion is entitled to weight. Additionally, the parties have stipulated to the prices at which petitioner's stock was bought and sold and have introduced into evidence petitioner's financial statements. Based on the record as a whole and particularly on the Casler sale, Gray's testimony, and petitioner's 1970 through 1974 financial statements, we conclude that Hooker's stock was worth $ 4.35 at June 30, 1974. The record contains no evidence which would indicate that the financial picture of Hooker changed significantly from June 30, 1974, to July 31, 1975. Therefore, the Casler sale, although occuring 13 months after the 1974 valuation date, is not so remote that it should not be considered. Cf. Tuck v. United States, 172 F. Supp. at 894-895. *416 [20] An additional factor is Gray's testimony that, based on his estimates of the company's future earnings, which he judged would be in the range of $ 500,000 to $ 600,000, petitioner's stock was worth between $ 4.25 and $ 5.25 at June 30, 1974. Gray's expectations as to future earnings were never fulfilled. [21] Nevertheless, in light of Hooker's earnings in 1970, 1971, and 1972 and its 1973 and 1974 increases in sales, we believe that a willing buyer and seller would estimate Hooker's future earnings, and its stock value, at the lower of Gray's range. In arriving at a value for 1974, we have also considered the fact that respondent and petitioner agree that the per share value of the company's stock was higher in 1974 than in 1975 -- a conclusion with which we concur. Petitioner's net income in *417 1974 was larger than that in 1975. Accordingly, it appears reasonable that the corporation's total worth at June 30, 1974, was greater than that at June 30, 1975. Additionally, we note that there were 45,000 less shares of stock (the 1975 ESOP contribution) outstanding in 1974 than in 1975. Thus, even were the total value of the corporation the same on both dates, the per share value would be greater for 1974. In light of the above considerations and weighing heavily against petitioner, who bears the burden of proof, we conclude that petitioner's stock was worth $ 4.35 at June 30, 1974. Respondent contends that petitioner's stock had a value of $ 2.17 on June 30, 1974, and $ 1.94 on June 30, 1975. [22] In support of his determination, respondent offers: (1) the Lloyd sale; (2) the report of his expert witness James Conley; (3) petitioner's buy-sell agreement with its founding shareholders. We have previously discussed our conclusion that the Lloyd sale is not indicative of the fair market value of petitioner's stock. See pages 22-23 supra. Conley valued petitioner's stock entirely on a price-earnings approach. We have several *418 disagreements with the manner in which Conley applied that method to the facts of the present case. In arriving at an earning's base, Conley erred in considering petitioner's operating income for only 1974 and 1975. We believe that the use of earnings over a five-year period provides a more representative measure of petitioner's performance, one that reflects "the competitive nature of [petitioner's] business and the vicissitudes of the economic environment." Concord Control, Inc. v. Commissioner, 78 T.C. (Apr. 28, 1982) (slip op. p. 10 n. 8). Recognizing that petitioner's 1974 ESOP contribution was abnormally large, Conley added the amount of the contribution back into petitioner's 1974 earnings. He then decided that in future years petitioner would be likely to make an ESOP contribution equal to the statutory limit for deductibility, i.e., 15 percent of qualifying salaries. Assuming, as both respondent's and petitioner's experts did, that after adding the 1974 contribution back into earnings some deduction is appropriate for an estimated annual ESOP contribution, [23] respondent's conclusion that petitioner's future contributions would equal the maximum deductible amount *419 is unfounded. Such large ESOP contributions would result, within a relatively short period of time, in Gary Hooker losing to the ESOP his status as majority shareholder. This clearly was not petitioner's purpose in establishing the ESOP. Prior to the ESOP, petitioner had a profit-sharing plan in effect. Contributions under that plan were $ 52,500 in 1971, $ 70,000 in 1972, and $ 50,000 in 1973. In light of those contributions, we find no basis for Conley's assumption that petitioner's future annual ESOP contributions would be in excess of $ 395,000. [24]
Additionally, we believe that Conley, in relying exclusively on a price-earnings approach, failed to consider other factors affecting the value of petitioner's stock. See generally Rev. Rul. 59-60, 1959-1 C.B. 237. [25] Conley summarily dismissed the higher values per share he arrived at when considering Hooker's book *420 value and the multiple at which comparable companies were selling over book value. Similarly, Conley gave no weight to petitioner's dividend-paying capacity because he concluded that the adoption of the ESOP had decreased petitioner's future capacity to pay dividends. We disagree with this analysis. The ESOP permits petitioner to compensate employees and get a corresponding tax deduction by contributing stock to the ESOP. Therefore, if it has any effect, the adoption of an ESOP would seem to improve petitioner's cash flow and thus its dividend-paying capacity. [26]
*421 In sum, we conclude that because of the weaknesses in Conley's report we cannot rely on its conclusion as to the stock's fair market value. One other factor enters into our analysis. In 1968, petitioner, Gary Hooker, and Casler entered into an agreement whereby upon the death of Gary Hooker or Casler, the company would be obligated to purchase the decedent's stock in the company (excluding any stock obtained through the ESOP). This buy-sell price was $ 2.83 per share at June 30, 1974, and $ 3.13 per share at June 30, 1975. [27] Respondent argues that these values have some bearing on the stock's fair market value. The buy-sell prices were calculated pursuant to a formula designed for a specific company purpose and there is no evidence that they reflect the prices at which a willing buyer would buy, or a willing seller sell, petitioner's stock. In light of the prices at which petitioner actually purchased its stock in 1975 and 1976, respondent's argument that petitioner thought its stock to be worth $ 3.13 in 1974 and $ 2.83 in 1975 is without force. *422 Issue 3. Write-off of Supplies Inventory
In 1974, petitioner took a deduction of $ 81,837.91 for its inventory of supplies. The expensed supplies were materials which were not acquired for resale or which did not physically become part of merchandise intended for resale. See section 1.471-1, Income Tax Regs. Respondent disallowed this deduction on the basis that petitioner changed its method of accounting for supplies (i.e., expensing supplies in the year purchased rather than in the year used) and did not obtain the prior approval required by section 446(e). [28] Petitioner argues: (1) $ 52,851.91 of the deduction is for inventory shortages, for supplies that were not on hand at June 30, 1974; (2) the deduction for the $ 28,986 of supplies remaining in inventory represented not a change in a method of accounting but rather the correction of an error in petitioner's usual method of accounting. [29]
*423 Although we agree with petitioner's general proposition that a deduction may be taken for inventory shortages, see, e.g., Lang Broom Co. v. Commissioner, 9 B.T.A. 39 (1927), the fact of the matter is that petitioner simply has not shown that any shortage existed at June 30, 1974. See Rule 142(a). Petitioner's books at June 30, 1974, showed supplies in the amount of $ 81,837.91. No physical inventory was taken at that time to establish whether or not that amount of supplies was actually on hand. It appears that at June 30, 1974, petitioner decided to write off its inventory of supplies; it had no idea of the extent, if any, of its inventory shortages. On this record, petitioner's estimates, made two years after the shortages supposedly occurred, are insufficient to establish either that an inventory shortage in fact existed or the extent of that shortage. The testimony of petitioner's comptroller, Mr. Twede, concerning the "shortage" was vague and unconvincing. For example, he stated that, although he knew there was not $ 30,681.25 of office supplies in inventory on June 30, 1974, he could not testify as to the actual amount on hand. As to the engineering and *424 maintenance supplies, Mr. Twede testified, "I can't state that I know that that figure wasn't there." We next address the issue of whether petitioner's write-off of supplies was the result of a change in an accounting method for which prior approval is required, see section 446(e), or the correction of an error which can be made without such approval, see section 1.446-1(e)(2)(ii)(b), Income Tax Regs. For the reasons stated below, we conclude that petitioner's write-off constituted a change of accounting requiring prior approval. Since petitioner has neither requested nor obtained such approval, we must sustain respondent's determination. See Southern Pacific Transportation Co. v. Commissioner, 75 T.C. 497, 681-682 (1980). Section 1.446-1(e)(2)(ii)(a), Income Tax Regs., provides -- A change in the method of accounting includes a change in the overall plan of accounting for gross income or deductions or a change in the treatment of any material item used in such overall plan. * * * A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction. * * * It is clear that in 1974 petitioner *425 changed the timing of its deduction for supplies. Prior to 1974, petitioner inventoried supplies and took a deduction for them in the year of use. In 1974, petitioner began to expense supplies when purchased. Our holding in Southern Pacific Transportation Co. v. Commissioner, supra at 680-687, that the expensing of repairs and maintenance expenditures which the taxpayer had previously capitalized constitutes a change in a method of accounting is clearly applicable here. See also Primo Pants Co. v. Commissioner, 78 T.C. (Apr. 26, 1982) (slip op. pp. 24-32). Nor do we believe that any argument can be made that the deduction is of such a relatively small amount that it cannot be considered "material." See Southern Pacific Transportation Co. v. Commissioner, supra at 684. Petitioner's argument that it was merely correcting an error in its method of accounting, for which it did not need to obtain permission, is without weight. Petitioner did not believe that it was expensing supplies and suddenly discover in 1974 that its bookkeeper had been "mistakenly" inventorying them. Compare Korn Industries Inc. v. United States, 209 Ct. Cl. 559, 532 F.2d 1352 (1976). *426 In this connection, we note that, although financial accounting standards are not controlling for tax purposes, petitioner's 1974 audited financial statements indicate that petitioner changed "to a different method of accounting for inventory of supplies." We likewise reject petitioner's argument that it was attempting to change from a clearly impermissible method of accounting to a permissible method. [30] The regulations under section 162 make it clear that supplies on hand at the end of the year need not be immediately expensed but may be carried on the balance sheet as a prepaid item to be deducted when actually used: Taxpayers carrying materials and supplies on hand should include in expenses the charges for materials and supplies only in the amount that they are actually consumed and used in operation during the taxable year for which the return is made, provided that the costs of such materials and supplies have not been deducted in determining the net income or loss or taxable income for any previous year. If a taxpayer carries incidental materials or supplies on hand for which no record of consumption is kept or of which physical inventories at the beginning and end *427 of the year are not taken, it will be permissible for the taxpayer to include in his expenses and to deduct from gross income the total cost of such supplies and materials as were purchased during the taxable year for which the return is made, provided the taxable income is clearly reflected by this method. [Emphasis added.] [Sec. 1.162-3, Income Tax Regs.] See also Madison Gas & Electric Co. v. Commissioner, 72 T.C. 521, 551 (1979), affd. 633 F.2d 512 (7th Cir. 1980). We recognize that section 1.471-1, Income Tax Regs., provides that "inventory should include * * * in the case of * * * supplies, only those * * * which will physically become a part of the merchandise intended for sale." This regulation, however, contrary to petitioner's assertions, does not mandate that supplies which do not become a part of the finished product be deducted in their year of purchase. Rather it merely excludes unused supplies, *428 which may be carried as a prepaid item, from the provisions of section 471, et seq., governing inventories. [31]
In sum, since petitioner was changing from one proper method of accounting to another proper method, it was required to obtain the prior approval specified in section 446(e). Decision will be entered under Rule 155. Footnotes
1. The petitioners in docket No. 16195-79 are Hooker Industries, Inc. (Hooker), and Superior Plastics, Inc., Hooker's wholly owned subsidiary. For convenience, all references to petitioner will be to Hooker alone.↩
2. Headers provide an equal path flow to exhaust gases leaving each engine cylinder through to the bottom. This in turn reduces exhaust system back pressure and improves scavenging to increase engine efficiency and performance.↩
3. It appears that the put option is open for 60 days from the time the stock is distributed to terminating participants. At all times relevant herein, petitioner had its stock appraised annually.↩
4. These amounts are for Hooker alone rather than the consolidated figures for Hooker and Superior. Some of Superior's employees were on Hooker's payroll and Hooker paid interest on money which it borrowed to lend to Superior. It is unclear whether those payments were classified as expenses of Hooker or Superior. These figures were taken from petitioner's financial statements and the 1974 and 1975 income figures reflect a deduction for an ESOP contribution. * This amount includes a $ 251,829 tax refund.↩
5. Book value was computed as assets minus liabilities divided by number of outstanding shares. The ESOP contribution for each year was classified as equity rather than a liability. Accordingly, the number of outstanding shares used to compute book value at the end of each year was the number issued after the ESOP contribution. The 1974 value was computed from Hooker's and Superior's consolidated balance sheet.↩
6. All references to Rules are to the Tax Court Rules of Practice and Procedure and all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. ↩
7. In this connection, we note that it appears from the bankruptcy schedules that, contrary to petitioner's assertions, rent and taxes owed by Superior did not have priority over Hooker's secured claim. See generally 9A Am. Jur. 2d 689, 690-691 (2d ed. 1980). Nevertheless, whether or not Hooker had priority over these claims, some portion↩ of the $ 116,000 would have been available to Hooker.
8. See also Butrick v. Commissioner, T.C. Memo. 1972-59↩.
9. Section 166(a)(2), governing the deductibility of partially worthless debts, provides as follows: When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. Respondent has not questioned whether or not the debt was "charged off within the taxable year." ↩
10. See also Bender v. Commissioner, T.C. Memo. 1967-26↩.
11. There is no dispute that petitioner's ESOP is a qualified plan under section 404. ↩
12. Respondent has not argued that petitioner's deductions were in excess of the section 404 limitation, perhaps because he was sufficiently confident that we would sustain his determination of value which apparently would bring the dollar amount of the contribution below the maximum limitation. Moreover, although petitioner's ESOP deduction for 1974 at the value per share as determined in this opinion is perhaps in excess of the section 404 limitation, it would appear that the limitation has no effect on 1974 or 1975 because any "excess" deduction merely increases petitioner's net operating loss. We need not determine what effect, if any, the 1974 deduction has on years not before us. ↩
13. Both petitioner and respondent agree that the stock is to be valued as of June 30, 1974 and 1975. Petitioner states that this value must be analyzed in light of the facts known on the final date on which petitioner could have made the ESOP contributions. Taking into account the extensions of time to file returns, this would be some time in March 1975 and 1976. We agree with respondent that petitioner's interpretation of section 404(a)(6) is erroneous and that the value should be determined in light of facts known on June 30. A taxpayer is allowed a grace period in which to make the actual ESOP payment because of the difficulty of computing the maximum deductible contribution before the close of that taxable year. Lozano, Inc. v. Commissioner, 68 T.C. 366, 369-370 (1977). We do not believe that the allowance of a grace period in which to make the payment changes the general rule, see Gray v. Commissioner, 2 B.T.A. 672, 682↩ (1925), that the value should be based on facts known at the valuation date, i.e., June 30. In any event, a review of the evidence indicates that petitioner's valuation was, in fact, based on facts known at June 30. 14. Respondent's deficiency notice stated the value of the stock to be $ 1.21 per share. Respondent, however, at trial and on brief, concedes the difference between $ 1.21 and the amounts listed above. Petitioner on reply brief argues that respondent's notice of deficiency was arbitrary and that the burden of proof should be shifted to respondent. See generally Greenberg's Express, Inc. v. Commissioner, 62 T.C. 325↩ (1974). There is no evidence in the record to substantiate petitioner's claim.
15. The provisions of Rev. Rul. 59-60, as modified, were extended to the valuation of corporate securities for income and other tax purposes by Rev. Rul. 68-609, 1968-2 C.B. 237↩.
16. If at the time Gray was setting the price, he believed that either Casler or Gary Hooker, as individuals, would purchase the stock, similar constraints would be operative. Gray would want to set a fair price so that the purchaser, with whom Gray would continue working, would not feel that Gray had forced him into paying too high an amount.↩
17. Respondent appears to be arguing that the number of shares involved in the Casler sale is an irrelevant factor to consider in valuing those shares. This appears to be contrary to Rev. Rul. 59-60, 1959-1 C.B. 237↩, 239, which states that, in valuing unlisted securities, the "size of the block of stock to be valued" is a relevant factor. In this connection, we note that, although the Casler sale involved a large number of shares, the block was insufficient to give an outside buyer majority control of the company.
18. Elly Wei's report was the basis for petitioner's 1975 ESOP deduction. ↩
19. See n. 26, p. 30, infra↩.
20. We note that the Casler sale took place only three months after the Lloyd sale and that respondent argues that the Lloyd sale is near enough in time to be considered in arriving at the 1974 value. ↩
21. Hooker's net income was approximately $ 328,000 in 1976, $ 327,000 in 1977, and $ 416,000 in 1978. These amounts reflect a deduction for any ESOP contribution made that year.↩
22. See n. 14, p. 17, supra↩.
23. For an argument that no deduction is appropriate if the ESOP contribution is made in stock, see S. Pratt, Valuing a Business: The Analysis and Appraisal of Closely-Held Companies 340-341 (1981). ↩
24. In fact petitioner made no ESOP contributions in 1976, 1979, or 1980. See p. 5, supra↩.
25. See n. 15, p. 17, supra↩. 26. Conley's lack of understanding of the issues involved in valuing the ESOP stock is further emphasized by his failure to consider several factors which, were we to accept Conley's earnings base as accurate, would have decreased his value per share. Conley took no discount for lack of marketability. We believe that one is appropriate. Although petitioner in 1975 and 1976 purchased stock from terminating ESOP participants, it was under no obligation to do so. The ESOP did not give terminating participants a put option but only gave the company a right to grant one if it so desired. See S. Pratt, n. 22, supra at 341-342. Additionally, Conley, in arriving at a value per share, divided the earnings base by the number of shares outstanding before the ESOP contribution. The proper method is to divide the number of shares outstanding after the ESOP contribution. S. Pratt, supra↩ at 341. The report of petitioner's expert witness adequately considered these various factors.
27. It appears that these values are determined by one-third book value plus two-thirds weighted net earnings capitalized at 10 percent.↩
28. Section 446(e) provides: Requirement Respecting Change of Accounting Method. -- Except as otherwise expressly provided in this chapter, a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary or his delegate. ↩
29. Petitioner appears to have abandoned its argument put forth at trial that the write-off of supplies should be permitted because it is in accordance with generally accepted accounting standards. In this respect, see Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 538-544↩ (1979).
30. Were such the case, it is unclear whether we would require taxpayer to obtain the consent specified in section 446(e). See Southern Pacific Transportation Co. v. Commissioner, 75 T.C. 497, 682↩ n. 208, 685.
31. It appears that the purpose of the above-quoted portion of section 1.471-1, Income Tax Regs., is to exclude supplies which do not become a part of the finished product from those items which a taxpayer can value at the lower of cost or market. See Spiegel, May, Stern Co. v. United States, 69 Ct. Cl. 110, 37 F.2d 988 (1930); Burroughs Adding Machine Co. v. Commissioner, 9 B.T.A. 938↩ (1927).