ESTATE OF JUANITA C. SMITH, DECEASED, DENNIS G. SMITH, PERSONAL REPRESENTATIVE, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Smith v. Commissioner
Docket No. 7839-91
United States Tax Court
T.C. Memo 1993-236; 1993 Tax Ct. Memo LEXIS 239; 65 T.C.M. (CCH) 2808; May 26, 1993, Filed *239 Decision will be entered under Rule 155. For petitioner: J. Jay Bullock. For respondent: J. A. Lopata. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined a deficiency of $ 96,930 in petitioner's Federal estate tax. After concessions by the parties, the issue for decision is the fair market value of various oil and gas mineral interest properties included in decedent's gross estate. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect on the date of decedent's death, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioner maintained its legal residence in Alpine, Utah, at the time of the filing of the petition. Petitioner is the estate of Juanita C. Smith, deceased (decedent). When decedent died on December 19, 1986, she owned 281 oil and gas mineral interest properties located in the eastern Utah counties of Duschene, Uinta, and Wasatch. The interests consisted of overriding royalty-producing interests, and nonoperating, nonproducing interests. Overriding royalty-producing *240 interests are valuable only if the lease produces oil, which in turn is dependent on an operator agreeing to drill and operate an individual well. Nonoperating, nonproducing interests are, by definition, just that. During the years prior to and during the year of decedent's death, decedent reported the following net income from these oil and gas properties on her Federal income tax returns: Net income from
Year
mineral interests
1984
$ 122,141
1985
114,381
1986
72,901
However, the parties subsequently determined and agreed at trial that only $ 50,250 of decedent's mineral interest property income was attributable to 1986. Decedent's 281 mineral interest properties were located in eastern Utah, approximately 250 miles east of Salt Lake City, Utah, in a rural area known as the Uinta Basin. The 281 mineral interest properties were fragmented and fractional interests spread over 242 "sections". A section is 640 acres of land. Of the 242 sections, 60 sections contained a total of 77 producing mineral interest properties. The remaining 204 mineral interest properties were nonoperating, nonproducing interests. In order to engage an operator to drill and operate *241 a well, each producing mineral interest property had to be under a "division order". A division order is a procedure whereby the owners of mineral interest properties agree with the owners of adjacent mineral interest properties to share the royalty proceeds earned from the specified area of a producing section. The mineral interest property owners subscribe to the terms and conditions under which the operator would drill and pump oil. The royalty proceeds from the area specified in the division order are combined and then reallocated to the individual mineral interest property owners. Decedent's percentage interests in the various division orders were generally substantially less than 1 percent. Each of decedent's 281 mineral interest properties required the maintenance of various title and other legal documents as well as information files. In addition, those mineral interest properties which were producing oil required substantial ongoing paperwork and oversight. They required, for example, providing sufficient title and other information to drillers and operators of the producing wells establishing proper title. Owners of producing interests also were required to negotiate *242 drilling and operating leases and to oversee output to ensure that the proper royalty payments were being received. Decedent's 77 producing mineral interest properties were operated in 60 different sections by approximately 20 different operators who made monthly payments to decedent prior to her death. The oil in eastern Utah is a paraffin-based oil with a high wax content. Crude oils with a high wax content and a relatively high "pour point" [1] necessitate additional procedures to be performed in order to pump and transport the oil successfully. Such procedures include pumping heated, low-wax-content crude oil into the well to heat the high-wax-content, paraffin-based crude oil enabling the oil to be freely pumped to the surface without wax buildup. Transportation then required heating the pipelines or using heated trucks, or mixing the high-wax-content, paraffin-based crude oil with enough low-wax-content crude oil to prevent wax buildup. *243 The nearest refinery of sufficient size to decedent's mineral interest properties was located in Salt Lake City, Utah, approximately 250 miles to the west. There was a pipeline designed to heat and carry high-wax-content, paraffin-based crude oil to the Salt Lake City refinery, but it was closed, thereby necessitating transportation by heated truck. In 1986, the oil and gas business in the Uinta Basin was at a low ebb. Oil prices had been trending down over the 2 years prior to decedent's death. Many of the drilling rigs and much of the pumping equipment was idle, and many drillers and operators had filed for bankruptcy. It would have been difficult for decedent to find buyers for her mineral interest properties. In order to liquidate the fractional mineral interest properties, decedent would have had to induce purchasers to obtain title reports at a cost averaging between $ 1,000 and $ 4,000 per property, incur mineral interest property recordation fees, and arrange for and execute division order assignments, all of which were expenses for which the buyer of such mineral interest properties was responsible. The fair market value of decedent's 281 oil and gas mineral interest *244 properties was $ 27,322 on December 19, 1986. OPINION Section 2031(a), which defines the gross estate, provides: The value of the gross estate of the decedent shall be determined by including to the extent provided for in this part, the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated.
There is no dispute that decedent's 281 mineral interest properties are includable in the gross estate; the only issue is the value of those mineral interest properties on the date of decedent's death. The regulations promulgated under section 2031(a) provide guidance regarding the valuation given to property properly within the gross estate: The value of every item of property includible in a decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of the decedent's death * * *. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. * * * [Sec. 20.2031-1(b), Estate Tax Regs.]
Both parties proffered the testimony *245 and report of an appraiser regarding the fair market value of decedent's mineral interest properties. Both appraisers were qualified in valuing oil and gas mineral interest properties and were accepted by the Court as experts, and their testimony and expert reports were admitted as such. Respondent's expert concluded that the property in question was worth $ 143,000 as of December 19, 1986, while petitioner's expert concluded that the property was worth $ 27,322 as of the same date. Thus, once again, this Court is faced with the task of resolving differences in the opinions of qualified experts. Once again, we must advise counsel that valuation cases such as this one are better suited for the give and take of the settlement process than for adjudication. See Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 451 (1980); Messing v. Commissioner, 48 T.C. 502, 512 (1967). However, since the parties were unable to resolve their differences regarding the valuation of decedent's mineral interest properties, the Court must do it for them. In determining the value of decedent's mineral interest properties *246 on December 19, 1986, we must take into account all of the facts and factors relevant to potential buyers to determine the proper value. Sec. 20.2031-1(b), Estate Tax Regs. Respondent's expert, Louis Elizondo (Elizondo), used a valuation technique that was somewhat simplistic. The methodology he employed to determine the value of decedent's mineral interest properties was simply to double the total reported annual income derived from the properties in the year of decedent's death, 1986. [2] By contrast, petitioner's expert, John D. Adamson (Adamson), utilized several methodologies in valuing decedent's mineral interest properties. Adamson examined comparable sales and list prices on adjacent and nearby mineral interest properties, conducted a discounted cash flow analysis for producing interests, and accounted for area-specific factors to individually value each of decedent's 281 mineral interest properties. *247 Elizondo's valuation was based solely on the reported annual income in the year of decedent's death. He stated in his report that "It is common in industry to value an interest at anywhere from 2 to 3 times annual income - often termed a 2 or 3 year 'payout'." While Elizondo was knowledgeable about oil and gas properties generally, he failed to account for the specific facts and factors that a potential buyer of decedent's mineral interest properties would have to take into account in determining what price would produce economic profits. Specifically, he failed to consider the impact of the buyer's transactions costs in purchasing fragmented and fractional mineral interest properties; the fact that sliding oil prices during the time period prior to decedent's death were causing drillers and operators to cease operations and, in some cases, file for bankruptcy; and the extra risks involved in drilling for, pumping, and transporting high-wax-content oil. Elizondo also failed to consider the likely difficulties involved in finding ready, willing, and able buyers for decedent's mineral interest properties. Adamson stated that given the fragmented and fractional nature of decedent's *248 mineral interest properties, it would be difficult to find a single buyer or even several buyers for such properties. Major oil companies would be unlikely candidates because the interests were too small and widely dispersed. Independent operators were more likely potential purchasers, but only if they were already profitably operating mineral interest properties in or near the section in which decedent's mineral interest properties were located. Many of these operators, however, were scaling back or going out of business during that period. Finally, Adamson stated that other mineral interest property investors would be possible purchasers. However, individual investors were likely to be deterred by the high acquisition-related transactions costs, the high transportation costs, and the then-slipping oil prices. Adamson valued decedent's producing mineral interest properties on a 2-year cash-flow basis with discounts for the time value of money, risk, and internal rate of return (10 percent, 16-18 percent, and 7-9 percent, respectively). Each producing mineral interest property was analyzed in terms of its recent output and its projected output over the next 2 years. Adamson *249 also confirmed the reasonableness of his valuation by reference to the industry's "barrel of oil equivalent" (BOE) figures. The BOE is the return expected (and required by a purchaser) from an amount of oil equivalent to a barrel of oil after drilling, operating, transportation, and other costs. Adamson found the relevant BOE figures were between $ 5 and $ 6. Adamson then determined that the expected output from decedent's mineral interest properties at the relevant BOE amounts produced a value slightly lower than $ 27,322, further supporting the reasonableness of his valuation. Respondent argues that "in determining the fair market value of an asset in the estate no reduction is allowed for a fictional seller's marketing cost or any other expense of sale", citing Estate of Park v. Commissioner, 57 T.C. 705, 710 (1972), revd. and remanded 475 F.2d 673 (6th Cir. 1973), and Payne v. United States, 35 AFTR 2d 75-1623, 75-1 USTC par. 13,059 (M.D. Fla. 1975). However, those cases are inapposite, and respondent's argument is misplaced. Petitioner's expert did not reduce the value *250 of decedent's mineral interest properties by a fictional seller's cost, but rather took the relevant costs and various factors that a potential buyer would have to pay and thus take into account in determining the price he would be willing to pay. This, of course, is consistent with the definition of fair market value. See sec. 20.2031-1(b), Estate Tax Regs. We have considered the qualifications and experience of the parties' experts, their particular knowledge and experience in valuing oil and gas mineral interest properties, as well as the substance and reasoning of their reports and testimony. Petitioner's expert was a practicing oil geologist who has dealt with eastern Utah oil and gas properties. He knew the characteristics of eastern Utah crude oil and the circumstances regarding its extraction and transportation as well as the unique particulars affecting the fair market values of eastern Utah oil and gas mineral interest properties, and thus had a good practical basis for his conclusions. Moreover, his conclusions were confirmed by an independent oil and gas consultant and an owner and operator of oil and gas properties in eastern Utah. Respondent's expert's analysis *251 was very academic and theoretical without a practical basis for his conclusions, especially with respect to the factors affecting the fair market value of fragmented and fractional oil and gas mineral interest properties in eastern Utah. Therefore, we conclude that petitioner's expert was more convincing, especially with respect to accounting for all relevant factors, including those that would be taken into account by potential buyers, and hold that the value of decedent's mineral interest properties on December 19, 1986, was $ 27,322. Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441 (1980). Decision will be entered under Rule 155. Footnotes
1. The pour point of a paraffin-based crude oil is the temperature at which the oil will maintain a viscosity such that free flow is possible without a wax buildup in the pipe.↩
2. Respondent recognized on brief that her expert doubled $ 72,901, an amount that did not represent the actual income attributable to 1986. As noted above, the parties agreed at trial that decedent's mineral interest royalty income attributable to 1986 was $ 50,250. Thus, even under respondent's expert's methodology, the value of decedent's mineral interest properties would be only $ 100,500.↩