JOHN OUGHTON AND PRISCILLA OUGHTON, Petitioners v. COMMISISONER OF INTERNAL REVENUE, Respondent
OUGHTON v. COMMISISONER
Docket No. 4580-90
United States Tax Court
T.C. Memo 1994-84; 1994 Tax Ct. Memo LEXIS 85; 67 T.C.M. (CCH) 2271; February 24, 1994, Filed *85 Decision will be entered under Rule 155. For petitioners: Raymond J. Farrell. For respondent: Keith L. Gorman. CLAPP
CLAPP
MEMORANDUM FINDINGS OF FACT AND OPINION CLAPP, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income taxes: Addition to tax
Year
Deficiency
Sec. 6661
1980
$ 28,621.62
--  1981
27,186.00
--  1982
550.70
--  1983
9,880.75
$  1,976.15
1984
69,657.51
13,931.50
1985
13,262.47
2,652.49
The issues for decision are: (1) Whether petitioners received dividend income of $ 14,837 in 1980. We hold that they did. (2) Whether petitioners are entitled to deduct the full amount of the fair market value of property contributed to a church in 1980. We hold that they are. (3) What was the fair market value of the donated property as of January 10, 1980. We hold that it was $ 177,780. (4) Whether petitioners are liable for additions to tax under section 6661 for 1983-85. We hold that they are. The deficiencies in and additions to petitioners' taxes determined for the years 1981-85 result from respondent's disallowance of a carryover of the excess charitable contribution deduction claimed *86 by petitioners for 1980. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. FINDINGS OF FACT We incorporate by reference the stipulation of facts and attached exhibits. Petitioners resided in Toms River, New Jersey, at the time the petition was filed. Dividend Income
Respondent determined that in 1980 petitioners received dividend income of $ 14,837 from First National Bank of Toms River, New Jersey (the bank). Hereinafter, petitioners will be referred to singularly as Mr. Oughton or Mrs. Oughton. Mr. Oughton was a vice president of the bank during 1980, and Mrs. Oughton's father, James E. Johnson (Mr. Johnson), was a director of the bank prior to 1980. Petitioners owned stock in the bank. Two 1980 Forms 1099-DIV were issued by the bank to petitioners totaling $ 14,841.80 in gross dividends, including $ 4.77 in capital gain distributions. The bank's cash dividend registers for the period January 1, 1980, through October 15, 1980, reflect that petitioners received cash dividends as follows: Amount
Stock
Payable
Account
of Payment
Record Date
Date John & Priscilla Oughton
$ 1,857.00
12/31/79
1/14/80
John & Priscilla Oughton
2,736.80
12/31/79
1/14/80
John & Priscilla Oughton
1,847.00
3/25/80
4/15/80
Priscilla Oughton
2,636.80
3/25/80
4/15/80
John & Priscilla Oughton
2.65
3/25/80
4/15/80
Priscilla Oughton
2.15
3/25/80
4/15/80
John & Priscilla Oughton
1,417.00
6/30/80
7/15/80
Priscilla Oughton
1,880.20
6/30/80
7/15/80
John & Priscilla Oughton
1,017.00
9/30/80
10/15/80
John & Priscilla Oughton
1,440.00
9/30/80
10/15/80
[1] $ 14,836.60
*87 Petitioners did not report the $ 14,837 on their 1980 Federal income tax return. Ownership and Contribution of Property
In September 1970, an entity named Ocean Asphalt, Ltd. loaned Jack Alvino (Alvino) money for which he conveyed title to 10 acres of property located at 381 Ward Avenue in Hamilton Township, Mercer County, New Jersey (the property) as collateral. At that time the property was subject to a $ 90,000 mortgage made by Alvino to Union Federal Savings and Loan Association. In 1969, Ocean Asphalt Ltd. was owned by Mrs. Oughton (50 percent), Robert E. Johnson, Mrs. Oughton's uncle and Mr. Johnson's brother (49.99 percent), and Mr. Johnson (.01 percent). In August 1973, Ocean Asphalt Ltd. deeded to Ocean Asphalt, a limited partnership, all of Ocean Asphalt Ltd.'s property interests in all lands situated in various New Jersey townships and counties, including Hamilton Township, Mercer County. The deed was recorded in the New Jersey counties of Ocean and Mercer in 1973. At some point thereafter, when Alvino defaulted on his loan repayments, Ocean Asphalt took possession of the property. On January 5, 1977, Mr. Johnson signed a deed transferring to Mrs. Oughton *88 all lands owned by Ocean Asphalt situated in various New Jersey townships and counties, including Hamilton Township, Mercer County. The deed was recorded in Ocean County, New Jersey, on January 6, 1977. In January 1980, Mr. Johnson arranged to have the property donated to the New Testament Baptist Church (the church), a tax-exempt organization. The public records for Hamilton Township, Mercer County, showed Ocean Asphalt as the owner of the property as of January 1, 1980. At the title company's request, four deeds were executed in January 1980 and recorded in March and April 1980 in Mercer County, New Jersey, in connection with the transfer of the property to the church. The first of these deeds was signed by Mr. Johnson as general partner of Ocean Asphalt, by Robert E. Johnson as a limited partner, and by Mr. Johnson again as "attorney-in-fact" for Mrs. Oughton as limited partner, and as "attorney-in-fact" for each petitioner individually. The deed recites that petitioners join in the deed individually because "Deed from Ocean Asphalt, a limited partnership, to Priscilla Ann Oughton, a married woman, never [was] recorded in Mercer County, New Jersey, but [was] recorded in Ocean *89 County, New Jersey". The second deed was signed by Mr. Johnson as general partner for Ocean Asphalt. The deed recites that as the only general partner for the partnership, Mr. Johnson was the grantor of the property, and that the only two limited partners were Robert E. Johnson and Mrs. Oughton. The third deed was signed by Mrs. Oughton as one of the limited partners of Ocean Asphalt, and by petitioners individually. The fourth deed was signed by Robert E. Johnson as one of the limited partners of Ocean Asphalt. All four deeds conveying the property to the church in January 1980 recite that the property was conveyed subject to a mortgage made by Alvino to Union Federal Savings and Loan Association, on which there was currently due approximately $ 40,000. Mr. Johnson took a charitable deduction in the amount of $ 1,158,468.38 on the 1980 partnership return of South East Mall, a New Jersey limited partnership, of which he was the general partner and owned a .001-percent interest [1] in its profits and losses. Petitioners deducted their distributive shares of South East Mall's charitable contribution deduction on their 1980 Federal income tax return, according to their respective *90 49.995-percent interests as limited partners in the partnership. Because of a 50-percent limitation on charitable contributions in effect in 1980, petitioners claimed and deducted the excess as carryover contributions in the years 1981 through 1985. Respondent determined the property's fair market value to be $ 100,000, and disallowed the deductions in excess of that amount taken on petitioners' 1980-85 Federal income tax returns. We find that as of January 1977, Mrs. Oughton was the owner of the property until its contribution to the church on January 10, 1980. Valuation
Alvino had continued to operate a swim club on the property in the summers until the year before it was transferred to the church. The *91 property had three swimming pools, including one Olympic-sized, and several smaller pavilions, dressing rooms, and concession stand type structures. There were two other buildings: a partially constructed, 7,120-square-foot, two-story masonry, commercial building intended to be a school and a 600-square-foot, framed office building. Real estate tax assessments for the property were as follows: Year
Land
Buildings
Total
1978
$ 75,000
308,400
383,400
1979
75,000
45,150
120,150
1980
75,000
20,000
95,000
1981
--
EXEMPT
--
Ocean Asphalt continued to pay taxes on the property even after the property's transfer to Mrs. Oughton in 1977. Mr. Johnson filed a petition of appeal on behalf of Ocean Asphalt with the Mercer County board of taxation requesting reassessment of the valuation of the property for the year 1979. In his appeal, Mr. Johnson requested the assessments be reduced as follows: land to $ 50,000, and buildings to zero, for a total property value of $ 50,000. The reason stated was that "building has been destroyed will cost over 25,000 [sic] to remove." Mr. Johnson's appeal was successful only in reducing the value of the buildings. An inspection *92 report was prepared by a Hamilton Township construction official and a fire protection subcode official in July 1979. The report ordered the pools to be removed, the unfinished school building to be boarded up completely, and all of the other structures on the property to be demolished because they presented hazards to the life and safety of the public and were deemed to be unsafe. Mr. Johnson valued the property at $ 1.2 million at the time of its contribution in January 1980. The church's minister recalled that Mr. Johnson requested that the church provide written documentation as to the property's $ 1.2 million value upon donation, which it did not do. Neither the pools nor the buildings were usable at the time of donation. The church received permission from the township to rehabilitate the school and office buildings. The minister estimated the cost to be about $ 1,000 in 1982 to make the office building usable. The school building's roof had been vandalized, but he was advised that it could be restored and renovated into a church, which eventually occurred. A new main electrical box was required before the property could be serviced with electricity at the time of donation. *93 In view of Mr. Johnson's $ 1.2 million valuation, the claimed deduction of $ 1,158,468.38, and the deeds' recitations that the property was conveyed subject to a mortgage of approximately $ 40,000, we find that the property was subject to debt in the amount of $ 41,531.62 (the difference between Mr. Johnson's valuation and the amount claimed as a deduction). The fair market value of the donated property as of January 10, 1980, was $ 177,780. OPINION Dividend Income
Dividends are includable in gross income under sections 61(a)(7) and 301(c)(1). The parties stipulated that petitioners owned the stock on January 1, 1980, and were issued Forms 1099 for dividends payable thereon during 1980 as reflected in the bank's cash dividends register. Petitioners argue that Mrs. Oughton transferred the stock to South East Mall, which sold it to Mrs. Oughton's mother, Susanna E. Johnson (Mrs. Johnson), who then transferred it back to petitioners during 1980. As evidence of Mrs. Johnson's "purchase" of the stock from South East Mall, petitioners presented a copy of a check made out to South East Mall dated April 10, 1980, for $ 962,576.84, drawn on and redeposited the same day into Mrs. *94 Oughton's bank account at the bank. Although the check and deposit slip bear Mrs. Oughton's printed name, Mr. Johnson both signed and endorsed the check. Mr. Johnson had signatory authority over the account that he used to handle the funds for several family-owned limited partnerships. To further corroborate their story that Mrs. Johnson owned the stock during 1980, petitioners presented a copy of a journal page prepared by Mrs. Johnson. The ledger is headed "Stock - First National Bank of Toms River, N.J.", and bears the dates April 30, 1980, and December 30, 1980. Next to the dates are the figures 962,576.84 and 991,640.84, respectively. Even though she prepared the journal and said she purchased the stock, Mrs. Johnson was not aware of the cost of the stock either at the time of the purported purchase or transfer back to petitioners. Mr. Johnson managed all the business affairs, and Mrs. Johnson kept the books according to his direction. In this manner of writing and depositing checks from and into the same account, purportedly to reflect transfers of ownership interests between family members and family-owned entities, Mr. Johnson attempted to "equalize" the various family *95 members' and entities' account balances. Mr. Johnson said he was very particular in making sure that whichever family member or entity "owned" the stock, reported the dividends on it. Indeed, Mrs. Johnson reported the $ 14,841.80 of dividend income on her 1980 return. Petitioners rely on the check, deposit slip, journal entry, and Mr. Johnson's testimony to support their position. Petitioners have failed to assert any facts establishing that Mrs. Oughton first transferred the stock to South East Mall. Mrs. Oughton was a key figure in the transactions in issue, and yet was not available at trial to answer questions regarding her particular knowledge of the transactions that petitioners assert took place. The Court is left with no choice but to assume that, had she been present to answer truthfully, the answers would not have been favorable to petitioners' cause. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). The evidence presented does not support petitioners' assertions that any stock transfers occurred. We therefore sustain respondent's determination that *96 petitioners received dividend income of $ 14,837 from the bank stock in 1980. Ownership and Contribution of Property
By amended answer, respondent asserts that Mr. Oughton had no interest in, and Mrs. Oughton had only a 50-percent interest in, the limited partnership that contributed the property to the church. Without asserting any facts that would disprove the validity of the January 1977 deed, respondent argues that petitioners are entitled to only one-half of the value of the contribution. Petitioners maintain that they had a 100-percent interest in the property, relying upon the January 1977 deed and Mr. Johnson's narrative to explain the transfer of ownership of the property from Alvino to Ocean Asphalt, to Mrs. Oughton, to South East Mall. As Ocean Asphalt's general partner, Mr. Johnson signed the deed conveying the partnership's interest in the property to Mrs. Oughton on January 5, 1977. Mr. Johnson did not have the deed recorded in Mercer County where the subject property is located because he wanted to shield Mrs. Oughton from any liability relating to the property. Petitioners never explained why the contribution was reported on South East Mall's return. *97 Although deeds affecting title to real estate in New Jersey are to be recorded in the county in which the property is situated, the 1977 deed is still valid and operative except as against subsequent judgment creditors without notice, and as against purchasers and mortgagees for valuable consideration without notice whose deeds are first recorded. N.J. Stat. Ann. sec. 46:22-1 (West 1989). As a donee of the property, the church is neither a judgment creditor nor a purchaser. Furthermore, the first of the January 1980 deeds reflects that the church had notice of the January 1977 deed and Mrs. Oughton's individual interest in the property. Ocean Asphalt, however, remained record owner of the property in Mercer County. In an abundance of caution to receive clear title, the church caused anyone and everyone possibly interested in the property to sign a deed in January 1980. Mrs. Oughton signed several of the deeds in January 1980 transferring her interest in the property to the church. As we found that she was the owner of the property on January 10, 1980, petitioners are entitled to deduct on their 1980 Federal income tax return a charitable contribution in the amount of the property's *98 fair market value, reduced by the amount of mortgage outstanding on January 10, 1980. Valuation
Section 170 allows a deduction for charitable contributions made during the year, with limitations on the amount currently deductible and a carryover of any excess contribution. The amount deductible for a charitable contribution of property is the fair market value of the property on the date of the contribution. Sec. 1.170A-1(c)(1), Income Tax Regs. Fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts. Sec. 1.170A-1(c)(2), Income Tax Regs.
Both parties submitted expert reports and testimony as to the property's fair market value. Both experts agreed that the highest and best use for the property was residential development due to its R-7 zoning for single-family residences on 7,000-square-foot lots. Petitioners' and respondent's experts did not substantially differ in their appraisals of the vacant land's fair market value at $ 140,623 and $ 137,400, respectively; rather they differed in their valuations *99 of the property's improvements. Petitioners' expert valued the unfinished school building, the office building, the swimming pools, and various other structures at their cost to replace, whereas respondent's expert valued them at their cost to demolish. Petitioners' expert, Joseph H. Martin (Martin), is a professional fee appraiser in Lawrenceville, New Jersey. Martin prepared a report dated September 10, 1990, appraising the property's fair market value on January 10, 1980, to be $ 245,000 as follows: land
$ 141,000
office building
15,793
school building
46,565
pools
20,000
outbuildings
10,000
misc. grounds
(lawn, landscaping, fence,
lighting, driveway)
10,000
$ 243,358
rounded to:
$ 245,000
Martin was familiar with the property as it existed in 1980. According to him, the 10.0445-acre, park-like property was unique in the high-density, residential municipality of Hamilton. First, the land was valued as if vacant and unimproved. The improvements were then valued by their cost to replace reduced by physical, functional, and economic depreciation. He did not use the sales or rental comparison approaches for valuing the improvements. Martin arrived at a *100 value for the land by averaging the prices paid per acre in three sales of vacant land in Hamilton during January 1980 ($ 13,708), July 1980 ($ 16,704), and March 1981 ($ 15,920). Martin indicated that the January 1980 sale of property was the nearest in time and physical proximity to the property in issue. He analyzed all of the sales data and made adjustments for various factors, including type of zoning and timing of sale, before arriving at a weighted average value of $ 14,000-per-acre. Martin used a $ 7-per-square-foot industrial classification from the Marshall and Swift's segregated cost method manual to value at cost the unfinished school building. By letter dated September 3, 1992, Martin revised his original appraisal report to the extent that it concluded that the ultimate highest and best use of the property was to demolish the existing buildings and develop the site for residential purposes in 1980. The letter indicates that due to the then-existing economic conditions -- double-digit inflation and interest rates -- the property's best use in 1980 was to continue its use as a summer day camp for an interim period. Martin reasoned that a knowledgeable investor/developer *101 would not have developed the property in the early 1980s; rather, such person would wait perhaps 3 years until economic conditions improved to become more favorable for new residential development. The property's improvements could have been utilized to provide a positive return for the interim period. Such interim use might provide a sufficient return to cover expenses (insurance, taxes, and maintenance) until the property could be used for its highest and best use, according to Martin. The addendum did not suggest any dollar amounts for the proposed interim income stream or change petitioners' bottom-line valuation. Martin admitted on cross-examination that in 1980 the property was not zoned for commercial uses and would have required a hardship variance for the type of interim use his addendum suggested. He also estimated that it would cost $ 280,000 to get the property into shape for such interim use. Furthermore, Martin said the property had not been used in 1979 as a summer camp and that under New Jersey law, after 1 year that would be considered an abandoned use. Yet he felt certain that if asked, the Hamilton zoning officials would have permitted the continued use as *102 a recreational facility, which is considered a passive use. Robert Melvin (Melvin), the supervising planner for Hamilton, stated that passive uses, for example, a public park, would be permitted under the R-7 zoning classification. However any commercial use, even a camp run for profit, would not have been a permitted use. The procedure for obtaining a zoning variance under New Jersey law requires a two-thirds majority vote from the municipal zoning board. Hamilton had just undergone a major rezoning effort in 1978-79. Absent a compelling special reason and promise of no adverse public impact, in Melvin's opinion, the board would be reluctant to grant a variance, particularly for any commercial use. Respondent's expert witness, Arthur D. Weller (Weller), is a professional real estate appraiser employed by the Internal Revenue Service. Weller also valued the land by averaging the per-acre price of several sales of similar property in the area. In view of residential development being the property's highest and best use, Weller valued the cost of demolishing all of the improvements and added these costs to the value of the vacant land. He arrived at a fair market value for *103 the property as of January 10, 1980, $ 177,780 as follows: land
$ 137,400
costs of demolishing: school building
30,880
pool (fill in)
4,500
misc. buildings
5,000
$ 177,780
Weller never inspected the property personally. He was unable to provide a satisfactory explanation for adding the cost of removing improvements to, rather than subtracting from, the property's value. In response to the interim use addendum to petitioners' report, Weller maintained that in his experience in Dade County, Florida, zoning variances are difficult to obtain. The determination of a property's fair market value is a question of fact to be resolved on the basis of the entire record. Kaplan v. Commissioner, 43 T.C. 663, 665 (1965). At $ 245,000 and $ 177,780, respectively, petitioners' and respondent's experts' appraisals of fair market value of the property on January 10, 1980, are not widely disparate. As this Court has admonished parties before, the issue is more properly suited for settlement than adjudication. Buffalo Tool & Die Mfg. Co. v. Commissioner, 74 T.C. 441, 451-52 (1980). Nonetheless, the parties insist *104 on our valuing the property. With regard to valuation of the land itself, both parties' experts considered the same January 1980 sale of almost 10 acres of identically zoned land abutting the property in issue. Based upon that sale's unit value of $ 13,708 per acre, we conclude that the fair market value of the subject property's land on January 10, 1980, was $ 137,690. In his 1979 appeal to the taxation board, Mr. Johnson valued the buildings at zero. The board responded by reducing the value of the buildings to $ 20,000 in 1980. The 1979 municipal inspection report ordered removal of all of the buildings except for the school building. Both experts agreed that the property's improvements must be demolished for the property's best and highest use for residential development. In spite of the foregoing, petitioners' expert valued the improvements at over $ 100,000, which seems high. With the benefit of hindsight we know that the church used both the school and office buildings and was still using the buildings at the time of trial, although we do not know the expenses incurred to make them usable. We conclude that the school and office buildings had some value on January 10, *105 1980. Respondent has asked us to find that the property had a fair market value on that date of $ 177,780. Although we fail to follow the reasoning and logic of respondent's method, subtracting the land's value of $ 137,690 from $ 177,780, places a value of $ 40,090 on the school and office buildings. After consideration of the experts' reports and the record before us, we conclude that the property had a fair market value of $ 177,780 at the time of its contribution to the church on January 10, 1980. Petitioners are therefore entitled to a charitable contribution deduction in 1980 in the amount of $ 136,248.38 (reflecting a $ 41,531.62 reduction for the amount of mortgage to which the property was subject at the time of its conveyance to the church). Lastly, we deny respondent's motion to exclude the interim use addendum to Martin's report as untimely under Rule 143(f). Petitioners mailed the addendum to their expert report to respondent 10 days prior to trial in this case. The interim use addendum did not add anything to petitioners' valuation, and therefore, was not prejudicial to respondent. It did not affect our decision on the valuation issue, as it appears to be nothing *106 more than argument. See Willamette Industries, Inc. v. Commissioner, T.C. Memo. 1992-407. Furthermore, our analysis of the property's fair market value renders the issue of interim use moot. Additions to Tax
Respondent determined that petitioners are liable for additions to tax for the years 1983-85. Section 6661(a) imposes a 25-percent addition to tax on the portion of any underpayment attributable to a substantial understatement of income tax for any year. An understatement of tax is "substantial" if it exceeds the greater of $ 5,000 or 10 percent of the tax required to be shown on the return for the year. Sec. 6661(b)(1)(A). An understatement is the difference between the amount required to be shown on the return and the amount actually shown on the return. Sec. 6661(b)(2). Petitioners claimed a charitable deduction on their 1980 return and carryover deductions in the years 1981-85 based on Mr. Johnson's unfounded $ 1.2 million valuation for the contributed property. Even their own expert's appraisal valued the property at less than a quarter of the amount claimed in 1980. Petitioners did not address section 6661 at trial or on brief, *107 and are therefore deemed to concede the additions. We sustain respondent's determinations under section 6661. Decision will be entered under Rule 155. Footnotes
1. This figure in the parties' stipulation appears as $ 14,841.80. ↩
1. This is the number appearing in Mr. Johnson's 1980 Schedule K-1 for South East Mall, although we assume that the number should be .01. The record does not contain South East Mall's partnership agreement, so we cannot verify whether there is indeed a partner outstanding with a .009-percent interest.↩